[Nos. G035101, G035154. Fourth Dist., Div. Three. Mar. 24, 2006.]

CONSUMER DEFENSE GROUP et al., Plaintiffs and Respondents, v. RENTAL HOUSING INDUSTRY MEMBERS, Defendants and Respondents;
BILL LOCKYER, as Attorney General, etc., Objector and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Thomas J. Greene, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Kathryn W. Egolf and Edward G. Weil, Deputy Attorneys General, for Objector and Appellant.

Graham & Martin, Anthony G. Graham and Michael J. Martin for Plaintiffs and Respondents.

Jeffer, Mangels Butler & Marmaro, Jeffrey K. Riffer, Malcolm Weiss and David Waite for Defendants and Respondents.

OPINION

**SILLS, P. J.—**

## I. INTRODUCTION

A prerequisite for the private enforcement by way of litigation of the warning provisions of Proposition 65 is a 60-day notice from the would-be private enforcer to the alleged violator and to relevant prosecutorial authorities—particularly the Attorney General's office—sufficient to give the alleged violator and the appropriate governmental authorities opportunity to both undertake a *meaningful* investigation and instigate remedial action *prior* to the filing of litigation. (*Yeroushalmi v. Miramar Sheraton* (2001) 88 Cal.App.4th 738, 740 [106 Cal.Rptr.2d 332] ["We conclude that the notices sent were insufficient because they failed to state sufficient specific facts to enable the alleged violators and the appropriate governmental agencies to undertake a meaningful investigation and remedy the alleged violations prior to citizen intervention. Thus, the trial court did not err in sustaining demurrers without leave to amend and dismissing the actions."].)

The present appeal centers on two sets of notices of violation of Proposition 65, each served on literally hundreds of apartment owners and managers.

The first notice was literally predicated on only two things: One, each apartment had . . . parking facilities! Thus the apartment allegedly "exposed" tenants and visitors to carcinogens in auto exhaust without giving them a Proposition 65 warning.

Two, each apartment did not prohibit tobacco smoking *everywhere* on the premises. Hence somewhere on the property the apartment allegedly "exposed" its tenants and visitors to secondhand tobacco smoke, again without posting a Proposition 65 warning.

The second notice was much longer. Like the first notice it included the allegation that someone, somewhere, might not be prohibited from smoking on the property. And like the first it included allegations that one might actually drive a car onto a parking lot on the property. But the second notice also alleged a host of additional things about each apartment that were . . . *indistinguishable from every other building in the state.* This longer notice was predicated on, among other things, the facts that the apartments had roofs (the constituent parts of roofing materials may themselves be carcinogenic), contained furniture (furniture often is made of a foam that is made of materials that may be carcinogens), permitted people to bring copy paper into the apartment (yes, literally speaking, carbonless copy paper "contains" carcinogens!) or are cleaned with various commercial cleaners.

The notices really were *that* broad—and we will prove it by quoting them at length, beginning on page 1191. If one were to take the notices at face value, a reasonable person would conclude this: All you need to have is paint on the walls, furniture inside, and a parking lot, and if you haven't posted a Proposition 65 warning, you are a "violator" of Proposition 65.

California's Attorney General became involved in the case by objecting to a settlement quickly arrived at by the front corporation prosecuting the private enforcement action on behalf of a law firm who consist of self-proclaimed bounty hunters,[1] and a trade group representing the apartment owners and managers. The trade group wanted to buy its peace and was willing to pay off the law firm to obtain it, in return for which the owners would also get a favorable deal with regard to any future litigation concerning alleged Proposition 65 violations. The bounty hunter lawyers wanted to get paid hefty fees, which is what the whole thing was obviously about in the first place. The trial court, however, concluded that it did not want to stand in the way of two consenting parties willing to settle.[2] The Attorney General has timely appealed from the orders approving the settlement.[3]

---

[1] At oral argument, Anthony G. Graham proudly proclaimed that he was a "bounty hunter. The statute was created for me." We will have more to say about exactly who Proposition 65 was created for later, but it wasn't bounty hunters. (See Health & Saf. Code, § 25249.7, subd. (d).)

[2] While the Attorney General asserts that the settlement was "collusive," we disagree. As we show anon, the defendant apartment owners tried to get a pretty good deal for themselves—in fact, too good a deal and that is one of the reasons the Attorney General objected to the settlement. Specifically, what the Attorney General sees as "collusive" is the attempt in the settlement to preclude future Proposition 65 litigation against the apartment owners, to the prejudice of future action by the Attorney General or other third parties.

[3] Technically, this appeal involves two different sets of notices, two different sets of trial court actions, and two different trial judges, since one retired while one action was still ongoing. It also involves two separate settlements. We will provide the details when we discuss the history of the litigation.

We must reverse. To affirm would be to nullify the regulations that require meaningful notice to prosecutorial authorities which differentiates the target business in Proposition 65 warning litigation from nontarget businesses so the Attorney General has a genuine opportunity to decide on behalf of the public whether Proposition 65 litigation is warranted. (See Cal. Code Regs., tit. 22, § 12903, subd. (b)(2)(F); see generally *Yeroushalmi v. Miramar Sheraton, supra*, 88 Cal.App.4th 738 [inadequate notice required dismissal of litigation].)

## II. BACKGROUND

### A. The Parties

Beginning in 2000, Consumer Defense Group and a related entity, The McKenzie Group, began this case by serving hundreds of notices of violations of Proposition 65 (Health & Saf. Code, § 25249.5 et seq.) on various apartment owners or property managers. Consumer Defense and McKenzie consist of Anthony Graham, his law partner, Michael Martin, Gayle McKenzie ("counsel to Graham & Martin") and Gayle McKenzie's brother. In other words, Consumer Defense Group and McKenzie are simply straw plaintiffs set up to enable the law firm of Graham & Martin to obtain legal fees in Proposition 65 litigation. We will therefore refer to the "plaintiffs" by the title most substantively accurate: Graham & Martin.

The defendants would ultimately turn out to be a group of about 170 apartment owners and managers, who aggregately manage over 1,000 apartment complexes. All defendants, however, would be represented by one law firm, apparently because the target apartment owners and managers are affiliated with the California Apartment Association.

### B. The Notices

Two different sets of notices appear in the record, though a number of apartments received both. The Attorney General's description of these notices as the "narrow notice" and the other the "global notice" is accurate, and we will adopt that description.

The "narrow" notice consisted of three pages of single-spaced type. The "global" notice consisted of about 21 pages of single-spaced text. We will not bury the text of these notices in footnotes. To adequately convey the nature of these notices, we will now quote much of the operative language of each notice (all would be prohibitive). And while it may be tempting for readers to

glance over the text of the notices, we invite readers to plow through them and, as they do, think about what the notices are actually saying. Under the heading for the "global" notice we will further include language from an exhibit B, attached to the global notice, which attempts to give "details of specific violations."

## 1. *The Narrow Notice*

"[¶] . . . [¶] This Notice is intended to inform the Violator that it has violated Proposition 65, the Safe Drinking Water and Toxic Enforcement Act (commencing with Health and Safety Code Section 25249.5) (hereinafter 'Proposition 65') by failing and refusing to post clear and reasonable warnings at facilities listed on Exhibit A hereto (which are owned and managed by the Violator) (hereinafter 'the Facilities') that the Violator (1) permits the smoking of tobacco products at the Facilities, which exposes customers, visitors and employees to tobacco smoke in the areas where smoking is permitted; and (2) permits the operation of motor vehicles at the Facilities, which exposes customers, visitors and employees to diesel and gasoline exhaust fumes, and the chemicals contained in those fumes, in the areas where such vehicles are allowed to be operated. [¶] . . . [¶]

"Persons representing CDG [Consumer Defense Group] have personally visited each of the Facilities in the period beginning September 2003 and ending February 2004 (hereinafter referred to as the 'Investigation Period'). During those investigations CDG discovered that the Facilities are owned and/or managed by the Violator, and that the Violator has more than nine employees. Those investigations showed that the Violator has chosen to allow its customers, visitors and employees at each of the Facilities to smoke tobacco products, and has specifically chosen to allow smoking in certain areas. Those areas are the apartments, the lobbies, corridors and hallways of floors where apartments where smoking is allowed are located, areas adjacent to pools, entrances and common areas where smoking is permitted, public walkways and parking areas where smoking is permitted. Further, those investigations showed that the Violator has chosen to allow its customers, visitors and employees at each of the facilities to operate motor vehicles in certain areas, the driveways and parking areas.

"In the Facilities and areas noted the Violator has chosen to allow its customers, visitors and employees to be exposed to: (1) tobacco smoke via the breathing of second hand tobacco smoke and via contact with their skin and clothing; and, (2) diesel and gasoline exhaust fumes via the breathing of

such fumes (inhalation) and by contact with the skin and clothing (dermal contact). . . ."

### 2. *The Global Notice*

#### a. General Allegations

"[¶] . . . [¶] The Violator has chosen to allow its tenants, visitors, guests, invitees, contractors and employees at each of its facilities to be exposed to Designated Chemicals associated with its operations . . . and in doing so has violated the statute. The Violator, in the ordinary course of business, knows controls and intends much of the conduct and actions of its tenants, visitors, guests, invitees, contractors and employees at each of the Properties listed in Exhibit A (hereinafter, 'the Properties'). The activities of the Violator including its employees and contractors, and the facilities and amenities provided at the Properties, expose tenants, visitors, guests, invitees, contractors and employees to Designed Chemicals. [¶] . . . [¶]"

Under the heading of "Environmental Exposures" the document continues:

"While in the course of doing business, at the locations in the attached Exhibit A, from March 1, 2000 through the date of this notice, the Violator has been and is knowingly and intentionally exposing tenants, visitors, guests, invitees and contractors, and employees to Designed Chemicals listed in the 'DETAILS OF GENERAL VIOLATIONS,' see below, and 'DETAILS OF SPECIFIC VIOLATIONS,' see Exhibit B, hereto, and known to the State of California to cause cancer, developmental toxicity or other reproductive harm without first giving clear and reasonable warning of that fact to the exposed persons (Health & Safety Code § 25249.6.) . . . ."

Under the "Details of General Violations" are these assertions:

"After appropriate due diligence and investigation of Violator's Properties and activities, including review and verification of detailed information regarding exposures to tenants, visitors, guests, invitees, contractors and employees, and consultations with experts on such matters, such unlawful exposures occur in the following ways at the Violator's Properties."

Then come 15 boldfaced headings, with assertions concerning various carcinogens and developmentally toxic materials under each section, which we will also quote:

"1. Second-hand Tobacco Smoke and Smokeless Tobacco Products

". . . . Smoking is generally allowed in outdoor common areas and other areas designated by the Properties' Manager, including individual apartments, resulting in exposure to tobacco smoke. [¶] . . . [¶]

"2. Combustion Products and Materials

". . . . Charcoal, artificial logs and fire starters . . . and wood burning in barbeques, hibachis and fireplaces emit carbon monoxide (developmental toxicity), . . . soots and tar (cancer) . . . creosotes (cancer). [¶] . . . [¶]

"Fireplaces, patio heaters, kitchen stoves and ovens . . . . which use natural gas . . . and other pressurized fuel gases emit carbon monoxide (developmental toxicity), formaldehyde (cancer), soots and tars (cancer), benzene . . . . toluene . . . and radon. . . . [¶] . . . [¶]

"3. Hobby-Related Products and Materials

"Arts and crafts hobbies include painting, ceramics and sculpture cause exposure to Designated Chemicals. Ceramic glazes and clays made by [certain manufacturers] contain crystalline silica . . . . Ceramic glazes and paints made by [certain manufacturers] depending on color, contain lead and lead compounds . . . . cadmium and cadmium compounds . . . . Crayons contain asbestos (cancer) and ceramic fibers (cancer). . . . Oil and solvent-based aerosol and non-aerosol paints, thinners and marking pens contain toluene . . . and benzene. [Brand name] Spray Adhesive contains toluene. . . . [¶] . . . [¶]

"4. Apartment Properties Construction Materials

". . . . Various types of roofing materials of various types when deteriorating or undergoing repair/replacement result in emissions of Designated Chemicals to which persons are exposed. (1) Built-up roofs contain asbestos . . . or fiberglass (ceramic fibers-cancer) felting and insulation that can be released through deterioration . . . built-up roofs also contain coal tar or petroleum asphalt which contain the following designated chemicals . . . chrysene, toluene diisocyanate . . . . nickel and nickel compounds, dichloromethane (methylene chloride), benzene . . . . Built-up roof insulation and repair uses sand and aggregate, which contains crystalline silica (cancer). [¶] . . . [¶]

"5. Potable Water Systems

". . . . Water and the conveyance and dispensing devices which contain and release lead and other chemicals . . . into drinking water include, but are not limited to: steel water pipes, water meters, solder used with copper plumbing, brass fittings, brass faucets, water purification processes and drinking fountains. [¶] . . . [¶]

"6. Paints, Finishes and Coatings

"Currently used paints, stains and coatings include but are not limited to: [Brand name] Aerosol Primers and Top Coats which contain toluene, [Brand name] Enamels which contain benzene" [and on and on through all the brands in a paint store and the carcinogens they contain].

"7. Furniture, Furnishings and Window Treatments

". . . . Carpeting and furniture construction materials include foams, metals, treated wood, fabrics, coatings, rubber parts and plastics and vinyl which contain Designated Chemicals including, but not limited to the following: Foams used in couches, seat cushions, carpet pads contain and emit methylene chloride (cancer), toluene diisocynate (cancer), and soots, tars and mineral oils (cancer). . . . [¶] . . . [¶]

"8. Brass Hardware, Metal Surfaces, and Electrical Wiring/Fixtures

"Brass keys, door knockers, door knobs and other entry way hardware, as well as decorative railings, fixtures, faucets, doors and furniture handles contain lead (cancer, developmental toxicity and other reproductive harm). . . . Fencing and other barrier hardware including safety railings and gates may be coated with colored polyvinyl chloride (PVC) which contains vinyl chloride monomer (cancer) . . . lead and lead compounds . . . cadmium and cadmium compounds . . . and cobalt and cobalt oxide (cancer).

"Lighting fixtures including electrical wires associated with fixtures located in apartments and common areas result in exposures to Designated Chemical emissions from PVC insulated wiring. . . . Exposures due to handling such insulated wire which contains vinyl chloride monomer . . . diethyl ethylphthalate . . . lead and lead compounds . . . cobalt and cobalt oxide . . . and cadmium and cadmium compounds . . . . [¶] . . . [¶]

"9. Natural Gas, Liquid Fuel Gases and Fuel Oil Combustion

"Natural Gas and other liquid fuel gases including, but not limited to Compressed Natural Gas (CNG), Liquefied Natural Gas (LNG) and Liquefied

Petroleum Gas (LPG) and Propane contain benzene . . . toluene . . . and radon (cancer); when such fuels are burned, combustion products are created and emitted which include, but are not limited to: carbon monoxide (developmental toxicity), formaldehyde . . . acetaldehyde . . . and soots . . . .

"10. Automobile Parking Facilities, Designated Loading/Unloading Locations and Transportation Services

". . . . These Properties have and operate automobile parking facilities, and designated bus and other public transportation and commercial vehicle loading/unloading areas which expose tenants, visitors, guests, invitees, contractors and employees to Designated Chemicals emitted from vehicle exhausts.

"11. Apartment Cleaning and Maintenance

"Specialty Cleaning Products such as carpet and floor cleaners, paint strippers and graffiti removers, including, but not limited to [brand name] Carpet Steam Cleaner . . . which contains nitriloacetic acid (cancer); [brand name] Aerosol Wax Stripper which contains ethylene oxide (cancer and reproductive harm); [brand name cleaners] contain ethylene oxide (cancer and reproductive harm) . . . .

"General Purpose Cleaning and Sanitizing Products, including, but not limited to: [brand name cleaners and disinfectants] contain chlorine and chlorine compounds which create and emit in the presence of methane and other organic materials in soiled surfaces, chloroform (cancer); [brand name cleaner] which contains benzene . . . and toluene . . . . [¶] . . . [¶]

"Other Cleaning and Janitorial Activities which result in Designated Chemical exposure including, but not limited to: Tile and other floor surface polishing generates dust containing crystalline silica (cancer) and ceramic fibers (cancer); polishing of metal surfaces especially brass generates dust containing lead . . . . [¶] . . . [¶]

"12. Exterior and Common Areas Maintenance and Cleaning

"Emissions of materials containing Designated Chemicals from Power Tool Use including, but not limited to skill saws, circular saws, table saws, band saws, mitre saws, sabre saws and jig saws; sanders, buffers and polishers, drills, planers and routers can contain any Designated Chemical contained on or in the construction materials, surface coating and paints being shaped or

sanded or from any abrasive materials . . . . The most common designated chemicals include: crystalline silica (cancer), lead (cancer, developmental toxicity and other reproductive harm), cadmium (cancer) asbestos . . . arsenic and its inorganic oxides . . . .

"Operation of Internal Combustion Engine Powered Landscaping Equipment including, but not limited to, lawn mowers, edgers, weed eaters and leaf blowers which emit gasoline engine exhaust (cancer). [¶] . . . [¶]

"13. Landscaping Maintenance Activities and Pesticides

". . . These Properties engage in landscape maintenance, including the application of pesticides and fertilizers, and other maintenance activities. Fertilizers, pesticides and herbicides contain Designated Chemicals to which tenants and other persons are exposed. [¶] . . . [¶]

"Fertilizers and soil amendments applied during landscaping and which may remain thereafter on surfaces or may be emitted into the air during application or thereafter. Such fertilizing materials include, but are not limited to, mineral-based fertilizers that contain lead acetate (cancer), lead (cancer and developmental toxicity and other reproductive harm), cadmium and cadmium compounds . . . arsenic and its inorganic oxides . . . hexavalent chromium compounds . . . and mercury and mercury compounds . . . . [¶] . . . [¶]

"14. Electronic and Electric Equipment and Associated Cables, Wires and Batteries

". . . Electronic equipment, including computer housings such as IBM and Apple Macintosh, keyboards, mouse devices, connecting cables, and insulated electrical wires are made from pigmented, plasticized polyvinyl chloride which contains vinyl chloride . . . lead . . . di(2-ethylhexyl) phthalate . . . and other chemicals . . . . [¶] . . . [¶]

"15. Office Supplies and Office Equipment

"Carbonless copy paper is used at the Properties and contains formaldehyde . . . benzene . . . toluene diisocyanate . . . and toluene . . . . Marking pens used at the Properties contain toluene . . . creosote . . . and ethylene glycol monoethyl ether . . . . Correction fluids used at the Properties are known to have contained trichloroethylene . . . and contain toluene . . . and

benzene. Copy machine toner used at the Properties contains carbon black (carbon black respirable sized aerosols and extracts cause cancer)."

 b. Specific Allegations in the Exhibit to the Global Notice

"After appropriate due diligence and investigation of Violator's Properties and activities . . . such specific unlawful exposures occur in addition to the General Violations in the following ways at the Violator's Properties.

"1. Swimming Pool/Jacuzzi/Hot Tub

"[Lists of apartment complexes and their addresses]

". . . . These properties have swimming pools, Jacuzzis and/or hot tubs which use disinfectants containing chlorine and bromine, which react with waterborne organic compounds, like methane, to form carcinogenic compounds. [¶] . . . [¶]

"2. Exercise Facilities

"[Lists of apartment complexes and their addresses]

"Exercise facilities located on these Properties contain exercise and gym equipment which contain Designated Chemicals . . . . [¶] . . . [¶]

"3. Indoor Clubhouse, Meeting Room or Other Indoor Common Areas, Laundry Rooms and Public Restroom Facilities

"[Lists of apartment complexes and their addresses]

"These properties have a clubhouse, meeting room, or other indoor common areas, laundry room and public restroom, which, in addition to containing and using cleaners and sanitizers, use odor cakes, air fresheners, soaps, and paper products which expose tenants, visitors, guests, invitees, contractors and employees to Designated Chemicals. [¶] . . . [¶]

"4. Food and Beverage Service Operations

"[Lists of apartment complexes and their addresses]

"These Properties provide and/or permit food and beverage services in common areas. Foods, water, and other beverages, which are consumed on the Property, as well as the glassware and tableware on which the food is served on the Properties cause exposure to Designated Chemicals.

". . . . Meats contain anabolic steroids (reproductive toxicity), testosterone and its esters (cancer) . . . . Produce contains chloroform (cancer) due to processing water that contained chlorine disinfectant and pesticide and fertilizer residues that contain designated chemicals . . . . Certain grains, cereals, nuts and peanut butter contain alfatoxins (cancer) as a naturally occurring fungal toxin . . . .

"5. Alcoholic Beverages

"[Lists of apartment complexes and their addresses]

"These Properties serve alcoholic beverages and/or allow tenants and other persons to serve/consume alcoholic beverages in common areas.

"6. Salon

"Included Properties: None[4]

". . . . These properties have a salon where manicure, pedicure, cosmetic treatments, massages and other personal body treatments are available. The salon utilizes many products containing a variety of Designated Chemicals. . . . [¶] . . . [¶]

". . . Hair dyes in use at the salon contain lead acetate (cancer). Nail polish and its removers in use at the salon contain toluene (developmental toxicity) and benzene (cancer). Lotions and other skin treatments in use at the salon contain progesterone (cancer) and mineral oils (cancer). . . .

"7. Emergency Generators

"Included Properties: None[5]

". . . These Properties have and operate emergency generators in the event of an interruption in utility-provided electricity, and periodically operating such generators for maintenance and testing results in diesel and/or gasoline engine exhaust and fuel vapors to which tenants, guests, visitors, invitees, contractors and employees are exposed. [¶] . . . [¶]

---

[4] If the reader has gotten this far, that's not a misprint. Obviously the "specific" violations list isn't so "specific"—this is evidence that the list was adopted from a macro obviously first used against hotel owners.

[5] See footnote 4.

"8. Maintenance Shop or Area

"[Lists of apartment complexes and their addresses]

". . . In furtherance of maintenance activities, these Properties operate a maintenance area or shop. Power tools are periodically used in this area which creates dust containing Designated Chemicals to which tenants [etc.] are exposed. [¶] . . . [¶]

"9. Dry-Cleaning Facilities

"Included Properties: None[6]

". . . These Properties operate on-site dry-cleaning facilities. Dry-cleaning activities use solvents as cleaning agents that are emitted from the facilities and clothing that has been cleaned. . . . [¶] . . . [¶]"

## C. The Litigation

This case is somewhat unusual in that the litigation was instigated as a vehicle for an ultimate consent judgment to which the parties had already agreed.

The settlement appears to have been finalized as early as December 2003.[7] The upshot of these negotiations was the filing of a complaint against the trade group members in June 2004,[8] a quick answer, and then the proffering of a proposed settlement in July.

There was, however, a perceived glitch which ultimately resulted in a clean-up, second lawsuit. (Hence the two case numbers in the caption to this opinion.) The required 60-day period between filing a notice and filing the complaint had not elapsed for a number of the trade group members when the first complaint (No. 04CC00589) was filed. So another complaint was filed in late October 2004 (No. 04CC00686) as a kind of mop-up for the otherwise not-timely-served members.

The first action was assigned to Judge C. Robert Jameson. The second action was initially assigned to Judge Ronald L. Bauer, who, after conferring

---

[6] See footnote 4.

[7] In a declaration by one of the trade group's counsel in support of the settlement's ultimate approval by the trial court, the lawyer states that a deputy Attorney General "has been aware of this proposed settlement since at least as early as December 2003."

[8] An amended complaint was filed in early July. The amended complaint listed 164 property owners and 917 properties. Rental Housing Industry Members answered the complaint on July 9, 2004.

with Judge Jameson, made an order reassigning the case to Judge Jameson. However, by December 2005 Judge Jameson was retiring, so the second action was reassigned to Judge Kim C. Dunning. That is the reason there are two judges in the caption.

### D. The Settlement

Both the first and second actions resulted in virtually identical settlements (except applying, of course, to the different members of the trade association). Here are the important provisions:

### 1. *The Attorney Fees*

In the first action, the trade group members agreed to pay Graham & Martin amounts totaling $513,000, consisting of various amounts paid by each management company. (E.g., West Coast Property, which manages a number of San Francisco apartments, agreed to pay $6,700, while Link Care Foundation, which manages a couple of properties in Fresno, agreed to pay $207.)

In the second action the trade group members agreed to pay some $123,000 to Graham & Martin, again in various amounts paid by each member. (E.g., Project Management, Inc., managing a number of properties in the Sacramento area, agreed to pay $8,502.02.)

### 2. *The Warnings*

The trade group members also agreed to post warnings, at the entries to each apartment complex. The warnings consisted of the standard "WARNING [¶] This area Contains Chemicals Known To the State of California To Cause Cancer and Birth Defects Or Other Reproductive Harm" plus the advisement that "More information On Specific Exposures Has Been Provided To Tenants and Is Available At www.prop65.org."

The Web site containing this further information (at least as of December 2005) is operated by counsel for the trade association in this case, and bears the logo of the California Apartment Association.

The Web site consists of two pages when printed out.[9] On the first page contains this language under the heading "Sources of Chemical Exposures":

---

[9] To clear up any ambiguity about the status of the Web site in the trial record, at oral argument the parties stipulated that a brochure that is in the record was identical to the contents of the Web site.

"California's Proposition 65 has identified hundreds of chemicals known to the State of California to cause cancer and/or birth defects or other reproductive harm. The law requires that businesses with 10 or more employees warn you prior to knowingly and intentionally exposing you to any of these chemicals when the exposure is over a certain level. While many exposures are associated with industrial activities and chemicals, everyday items and even the air we breathe routinely contain many of these chemicals. This brochure provides warnings and information regarding exposures to these chemicals that occur in this facility. In many instances, we do not have information specific to this facility. Instead we have relied upon experts in this field to tell us where and to which chemicals these exposures might occur."

The second page identifies nine (obvious) generic types of sources of substances that might cause cancer. Again, we quote highlights:

"Second Hand Tobacco Smoke and Tobacco Products

". . . . Smoking is permitted in certain common and private areas.

"Furnishings, Hardware, and Electrical Components

". . . . Furniture, foams, brass keys, electric power cords, carpeting, carpet padding, wall coverings, wood surfaces, and vinyl, contain a number of chemicals, including lead and formaldehyde, known to cause cancer . . . .

"Combustion Sources

". . . . Any time organic matter such as gas, charcoal or wood is burned, Proposition 65-listed chemicals are released into the air.

"Construction and Maintenance Materials

". . . . Construction materials used in walls, floor, ceilings and outside cladding contain chemicals, such as formaldehyde resin, asbestos, arsenic, cadmium and creosote, which are released as gases or vapors during normal degradation or deterioration, and as dust or particulate when disturbed . . . .

"Certain Products Used In Cleaning And Related Activities

"Certain cleaning products used for special cleaning purposes such as . . . spot and stain lifters contain chlorinated solvents including perchloroethylene . . . .

"Swimming Pools and Hot Tubs

". . . . Chlorine and bromine are used in the disinfecting process [which] can cause exposures to chloroform and bromoform which are chemicals known to the State of California to cause cancer.

"Paint and Painted Surfaces.

"Certain paints and painted surfaces contain chemicals, such as lead and crystalline silica, that are known to the State of California to cause cancer . . . .

"Engine Related Exposures.

"The operation and maintenance of engines, including automobiles, vans, maintenance vehicles, recreational vehicles, and other small internal combustion engines are associated with this residential rental facility . . . .

"Pest Control and Landscaping.

"Pest[s] control and landscaping products used to control insects and weeds contain resmethrin, mycobutonil, triforine and arsenic trioxide which are known to the State to cause cancer . . . ."

### 3. *What the Apartment Owners and Managers Got out of the Deal*

The trade group bargained for as much future immunity for Proposition 65 litigation as the law could arguably confer. Thus the settlement contains a statement that "this Consent Judgment will have res judicata and collateral estoppel effect to the extent allowed by law with regard to both the Proposition 65 allegations and the Unfair Competition Act allegations."

Another part of the deal was a de facto alliance with Graham & Martin to preserve that immunity. Thus another part of the settlement provided that in any litigation instituted by a third party or governmental entity, the trade group and the plaintiffs would "affirmatively cooperate in all efforts to defend against any such litigation." (Thus the trade group has tied its own hands from taking positions in this appeal that one might naturally expect it to take, such as that Graham & Martin's fee claims are excessive in relationship to the work done and public interest involved.)

The trade group also expressly refused to admit any past wrongdoing.

### E. The Attorney General's Opposition to the Settlement

In October 2004 the Attorney General filed opposition to the joint motion of the plaintiffs and the trade group for approval of the settlement in the first case and in December 2004 filed opposition to the motion for approval of the settlement in the second case. The Attorney General raised a variety of issues:

—The fees paid to Graham & Martin were unreasonable. In this regard the Attorney General pointed out that about half the hours for which Graham & Martin wanted payment were for "pre-filing investigations."[10]

—The notices were vague, inadequate and overbroad. The opposition pointed out in this regard that the notices did not "allege a violation with respect to any particular exposures," but were intended to "cover every imaginable occurrence, so that it may be 'covered' by the judgment and thereby provide future immunity to defendants."

—The certificates of merit did not have adequate supporting documentation.

—The proposed warnings were inadequate because they were insufficiently specific. (For example, "stating that pest control and landscaping compounds are used provides no real description of the source of any actual exposure, and there is no reason to suspect that all of the defendants in fact use pesticides containing chemicals subject to Proposition 65.")

The Attorney General's opposition to the second settlement was essentially a refinement on its opposition to the first settlement. For example, in these papers the Attorney General pointed out that the bulk of Graham & Martin's hours were accrued by Gayle McKenzie for traveling to the apartments and that Graham & Martin wanted to be paid attorney rates for what was fundamentally nonattorney work. (Though McKenzie is an attorney.) The Attorney General also noted that the time entries for "preparation of initial notices" were suspect, and specifically pointed out that Graham & Martin claimed 117 hours of attorney time spent on "Pre-Initial Notice On-Site Investigation" for notices on defendants which the Attorney General's office never received.[11] Another "suspect" entry was over 120 hours for "client

---

[10] Including some evidence to show that the amount of time supposedly spent on prefiling investigations was falsified. Specifically, the Attorney General offered the declaration of a property manager of a group of properties who recounted a conversation with Graham & Martin's investigator who admitted that only four of eight properties were inspected when statements in one of the notices had claimed that all eight had been inspected.

[11] See also footnote 10, *ante*, for evidence of falsification of investigator time.

consultation," which was nothing more than the attorneys talking to each other. Additionally, the Attorney General repeated the points that the certificates of merit were inadequate, the notices of violation were inadequate and overbroad, and the warnings were not in compliance with the statute.

### F. The Trial Courts' Disposition of the Opposition

Judge Jameson heard the opposition to the first settlement in October 2004, Judge Dunning heard the opposition to the second in mid-December 2004, which was continued over into early 2005.

Judge Jameson heard argument, and simply stated that "I do not think the position taken by the Attorney General is well-taken. [¶] We've got four years of litigation, dozens of defendants, an-depth investigation occurring." The only indication of his reasoning was a statement in oral argument that "to tell these folks at this stage that their notice is insufficient" was "kind of after the barn door."

Ironically (because it involved less money) Judge Dunning's hearing went much longer (two sessions), and oral argument was far more interactive. The court voiced concerns on such issues as whether the court could do anything different from what Judge Jameson had already done in the first settlement, whether it was appropriate for an investigator to charge fees at attorney rates, and whether any reduction in fees might destabilize the remainder of the settlement. Ultimately, the court approved the settlement but reduced the fees to $35,000 in conjunction with a side agreement that another $30,000 would be paid to the American Cancer Society.

### G. The Appeal

Notice of entry of the first consent judgment (the one approved by Judge Jameson) was given on December 10, 2004 (an amended one was filed December 12). The Attorney General filed its notice of appeal on February 4. Notice of entry of the second consent judgment (the one modified and as modified approved by Judge Dunning) was given on February 9, 2005, and the Attorney General filed a notice of appeal on February 16, 2005. This court subsequently consolidated the two appeals.

### III. LEGAL ANALYSIS

### A. Attorney General's Right to Appeal

We first must deal with a procedural matter. Both Graham & Martin and the apartment industry trade group claim that the Attorney General has no right to appeal the matter.

The key statutory text is section 25249.7, subdivision (f)(5) of the Health and Safety Code, which states in pertinent part: "The . . . Attorney General . . . may appear and participate in any proceeding without intervening in the case." The trade group says that "participate" does not include initiating appeals.

*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175 [34 Cal.Rptr.3d 258] has already dealt with this specific issue. There, a private enforcer sued a manufacturer of implantable surgical devices for not warning of the nickel in them. (*Id.* at p. 1178.) Like the present case, the matter was resolved with a consent judgment, and the judgment was approved by the trial court, and the Attorney General challenged the judgment on appeal. (*Id.* at p. 1179.) The private enforcer argued that the Attorney General had no standing. Adumbrating the trade group's argument here, the private enforcer asserted that while the Attorney General had the right to "participate" in a proceeding, the Attorney General could not "initiate an appeal." (*Id.* at p. 1179, fn. 3.)

The *Consumer Cause v. Johnson & Johnson* court rejected the enforcer's participate-yes, appeal-no argument as "unreasonably strained." The court held, albeit without elaboration, that the Attorney General was a party whose interest was "injuriously affected by the judgment," and therefore had a right to appeal. (*Consumer Cause, Inc. v. Johnson & Johnson, supra*, 132 Cal.App.4th at p. 1179, fn. 3, citing Code Civ. Proc., § 902; see *Winter v. Gnaizda* (1979) 90 Cal.App.3d 750 [152 Cal.Rptr. 700].)

We need only add that the *Consumer Cause, Inc. v. Johnson & Johnson* court's conclusion is sound on the merits. The Attorney General's right to "participate" in a "proceeding" would be meaningless if it carried no inherent right to appeal. For example, one of the issues raised by the Attorney General here (and, interestingly enough, a subtext of the *Consumer Cause, Inc. v. Johnson & Johnson* case as well[12]) is the collusiveness of a Proposition 65 settlement. The Attorney General is properly worried about, among other things, sweetheart deals that attempt to insulate genuine violators of Proposition 65 by way of res judicata or collateral estoppel. As the office states in its opening brief, this is a case where a suit has been prearranged "as a method of obtaining a judicial imprimatur on" the parties' conduct.

[12] In *Consumer Cause, Inc. v. Johnson & Johnson*, the enforcer and an industry group made a deal in which the industry admitted no violation, the enforcer conceded there never was a violation, the enforcer's attorneys were paid a large sum, and there was a complicated series of provisions to protect industry members against litigation from claims of *future* violations. (*Consumer Cause, Inc. v. Johnson & Johnson, supra*, 132 Cal.App.4th at p. 1182.)

While we do not believe this particular settlement is, strictly speaking, "collusive," the very possibility of collusive settlements easily demonstrates the Attorney General's right to appeal: If the Attorney General has no right to appeal the approval of a settlement (as distinct from merely voicing opposition at the trial level), then the most egregiously collusive settlement— contrary in every imaginable way to the public interest—would be insulated from attack if the trial judge were under the legal misimpression that he or she had no choice but to approve it.

Proposition 65 was created to protect the *public*.[13] (See § 1 of initiative measure, Prop. 65 (Nov. 4. 1986), reprinted at 40E West's Annot. Health and Saf. Code (2006 ed.) at p. 322; Health & Saf. Code, § 25249.7, subd. (d).) The one party who *necessarily* represents the public interest in any Proposition 65 litigation is the Attorney General. The plaintiff may or, as here, may not represent the public interest; the plaintiff, as here, may be nothing but a shell entity for lawyer bounty hunters. It is therefore unthinkable that private parties, acting unilaterally and over the objection of the Attorney General, could fashion a settlement that was contrary to the public interest, have that settlement insulated from appellate review, and perhaps even be given res judicata effect against future actions that might necessarily be in the public interest.[14]

Further support for our conclusion is found in another Consumer Cause case, *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc.* (2005) 127 Cal.App.4th 387 [25 Cal.Rptr.3d 514]. That case involved an unnamed member of the public who thought that a settlement with a market (ironically, a settlement with a market specializing in organic fruits and vegetables) went too easy on the market. He said the settlement was unfair and the release " 'vastly overbroad,' " but the trial court still approved the settlement. (See *id.* at p. 394.)

The member of the public appealed. The health food market (like the trade group here) argued that the member of the public lacked standing to appeal. The appellate court easily batted that argument down: "A class member who appears at a fairness hearing and objects to a settlement affecting that class member has standing to appeal an adverse decision notwithstanding the fact that the member did not formally intervene in the action." (*Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc., supra,* 127 Cal.App.4th at p. 395.)

---

[13] Compare footnote 1, *ante.*

[14] We emphasize, of course, that the issue of whether the Attorney General could be bound by a settlement reached by a private plaintiff is not presented in this case, and we express no opinion on it. This opinion should in no way be read for the idea that the Attorney General could be bound by private settlements in private Proposition 65 suits.

Again, given that private-enforcement Proposition 65 actions are brought "in the public interest" (Health & Saf. Code, § 25249.7, subd. (d)), it would be highly anomalous that any member of the affected public would have standing to object to a settlement and prosecute an appeal—we'll call that the "*Mrs. Gooch's* rule"—yet the Attorney General or other prosecutorial authorities who are specifically charged with enforcing Proposition 65 "in the name of the people" (Health & Saf. Code, § 25249.7, subd. (c)) would not have the same right.

Finally, the Attorney General points out an analogy to class action law, which we find convincing. When parties seek a judicial imprimatur on a class action settlement, it is enough that objectors appear and object to the settlement in the trial court for there to be a right to appeal. (See *Wershba v. Apple Computer* (2001) 91 Cal.App.4th 224, 235 [110 Cal.Rptr.2d 145] ["Class members who appear at a final fairness hearing and object to the proposed settlement have standing to appeal."].) Here, if anything, there is an even stronger public policy in allowing the one party who unequivocally represents the public interest in Proposition 65 litigation to have standing to appeal based on objections to a proposed settlement.

### B. The Challenge to the Notices

#### 1. *Are the 25249.7, Subdivision (f)(4) Factors Exclusive?*

Both Graham & Martin and the trade group argue that the Attorney General has posited an extrastatutory ground on which a trial court may reject a settlement in a Proposition 65 case, namely that the notices are insufficient. To be more specific, section 25249.7, subdivision (f)(4) of the Health and Safety Code, mentions three factors necessary for a trial court to approve a settlement, and the sufficiency of the notices isn't one of them. From that fact Graham & Martin and the trade group extrapolate the conclusion that the sufficiency of the notices is independent of, irrelevant to, and can have no bearing on whether a trial court should approve a settlement.

■ The argument fails in light of the actual syntax of the statute. The statute doesn't say that a trial court can *only* look at three factors, and if those factors are present, it *must approve* the settlement. Rather, it says that the trial court *must look* at the three factors and if any of those factors are not present, it *can't* approve the settlement. There is a difference.

Here is the exact text of Health and Safety Code section 25249.7, subdivision (f)(4): "If there is a settlement of an action brought by a person in

the public interest under subdivision (d)[15], the plaintiff shall submit the settlement, other than a voluntary dismissal in which no consideration is received from the defendant, to the court for approval upon noticed motion, and the court may approve the settlement only if the court makes all of the following findings: [¶] (A) Any warning that is required by the settlement complies with this chapter. [¶] (B) Any award of attorney's fees is reasonable under California law. [¶] (C) Any penalty amount is reasonable based on the criteria set forth in paragraph (2) of subdivision (b)[16]."

By its express terms, this statute limits trial courts from approving any settlement unless "all of the following findings" are made. The statute does not say that a trial court *must* approve a settlement if those findings are made.

The question arises: Perhaps the statute *implies* that a trial court must approve a settlement if the three requisite findings are present? No. Specific statutes must be interpreted as part of the whole of the statutory scheme in which they appear. (E.g., *People v. Pieters* (1991) 52 Cal.3d 894, 899 [276 Cal.Rptr. 918, 802 P.2d 420] ["we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness' "].) Notice to the Attorney General and other public prosecutors is an important part of the general enforcement of Proposition 65. The purpose of these notices is to enable "meaningful investigation" by those public authorities "prior to citizen intervention." (*Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 740.) As the Attorney General pointed out in oral argument, it does not serve the public interest to have almost the entirety of the state of California "swamped in a sea of generic warning signs."

Thus, if the insufficiency of the notice cannot be *a* reason for the trial court to reject a settlement, then the investigation requirement could easily be circumvented. Would-be private enforcers could easily overwhelm the Attorney General's office with a torrent of notices, and by the time the office got a handle on whether there was anything that actually needed investigation or remediation, the enforcers would have already negotiated, Trevor-Law Group style, a myriad of settlements that would then, at least under Graham &

---

[15] Subdivision (d) is the provision in section 25249.7 which authorizes private enforcement of Proposition 65 under specified conditions.

[16] Paragraph (2) of subdivision (b) enumerates six factors to be taken into consideration in "assessing the amount of a civil penalty for a violation of this chapter" plus a catch-all "Any other factor that justice may require" factor.

Martin and the trade group's theory, be untouchable.[17] (See also *DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 975 [14 Cal.Rptr.3d 787] [affirming order of dismissal based on prelitigation absence of certificate of merit even though plaintiff offered to cure the failure after litigation began because such late service "would reduce the effectiveness of prelitigation efforts by the Attorney General to discourage filing the frivolous suit in the first place"].) As the Attorney General points out here, the breadth of these notices "deprived the Attorney of a 'meaningful opportunity to investigate.' "

We know from *Yeroushalmi* that (1) insufficient notices are grounds to sustain a demurrer without leave to amend. We know from *DiPirro v. American Isuzu Motors, Inc., supra,* 119 Cal.App.4th 966, that (2) the failure to include a certificate of merit with the notice is grounds for dismissal even if such a certificate is offered after the litigation has begun. (The same point was recently reiterated in *In re Vaccine Cases* (2005) 134 Cal.App.4th 438, 454 [36 Cal.Rptr.3d 80, 91].) It would be inconsistent with these rulings to hold that such otherwise fatal defects could be "cured" by putting together a settlement before anybody raised the issue to the trial court so as to, in effect, sandbag the Attorney General from objecting to the ultimate outcome.

## 2. *The Sufficiency of the Notices*

The requirement that any private enforcer first give the Attorney General 60 days' notice before commencing any private litigation to enforce Proposition 65 has been in the law since it was passed by initiative in 1986. As the court noted in *Yeroushalmi,* "citizen enforcement was conditioned upon the failure of state and local government agencies to commence or diligently prosecute an action, after due notice." (*Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 748, citing Prop. 65; see now Historical and Statutory Notes, 40E West's Ann. Health & Saf. Code (2006 ed.) foll. § 25249.7, p. 339.)[18]

Regulations have specified required content for such notices since 1997 (Cal. Code Regs., tit. 22, § 12903 (hereinafter regulation 12903).) Since the

---

[17] This point also disposes the point raised by the trade group that the Attorney General must formally "intervene" in any litigation (as distinct from "participate") before he or she can appeal. Accepting the argument creates the potential to overwhelm the resources of a public agency.

[18] The concern was to track analogous federal law so as to prevent private enforcement actions from becoming a nuisance in their own right. In noting analogies between Proposition 65 and the federal Clean Air Act, the *Yeroushalmi* court noted the potential for disruption posed by private enforcement and the federal solution to it: "Congress recognized the ' "obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts," ' and placed explicit restrictions on citizen suits, including the 60-day notice requirement." (*Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 749, citing *Friends of the Earth v. Consolidated Rail Corp.* (2d Cir. 1985) 768 F.2d 57, 63.)

present case involves individual apartment complexes and supposed environmental exposures to carcinogens on apartment property, we will now quote the entirety of regulation 12903, subdivision (b)(2)(F), which governs environmental exposures: "For notices of violation of Section 25249.6 of the Act involving environmental exposures as defined in subsection 12601(d) of this chapter, the notice shall identify, the location of the source of the exposure. Where numerous sources of the exposure are alleged, the location need not be listed if the notice identifies each facility or source of exposure by stating those common characteristics that result in the allegedly unlawful exposure *in a manner sufficient to distinguish those facilities or sources from others for which no violation is alleged.* The notice shall state whether the exposure for which a warning allegedly is required occurs beyond the property owned or controlled by the alleged violators." (Italics added.)

Regulation 12903 was construed by the court in *Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th 738, which was essentially an attempt by a professional Proposition 65 plaintiff to do to a group of hotel and other building owners[19] what Graham & Martin have attempted to do to a group of apartment owners in this case—shake them down for attorney fees based on the absence of Proposition 65 warnings based on so-called "exposures" such as the absence of an absolute prohibition of smoking on the premises. (See *Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at pp. 746–747.)[20]

▇ Unlike this case, however, the targeted business resisted the shakedown, successfully contending, at the pleading stage, that the notices were inadequate. (See *Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 741 [noting dismissals after demurrers and judgments on the pleadings].) The appellate court vindicated their gumption: After looking at analogous federal authorities involving the Clean Air Act, the court established that "the framers of the initiative [Proposition 65] intended that the notice contain sufficient *facts* to facilitate and encourage the alleged polluter to comply with the law, and to encourage the public attorney charged with enforcement to undertake its duty." (*Yeroushalmi, supra,* 88 Cal.App.4th at p. 750; see also Cal. Code Regs., tit. 11, § 3202, subd. (a) [Attorney General's own guideline

---

[19] The opinion does not indicate why an oil company, Arco, was sued along with such hoteliers as the Westin Bonaventure and the Miramar Sheraton.

[20] We are not the first to use the allusion to extortion to describe this litigation. In oral argument in December 2005 in the second action, Judge Dunning used it in the precise context of the reasonableness of the attorney fees: "The court: Okay. I guess I'm just not making myself clear. The court is concerned with the reasonableness of attorney's fees in this case. This case is very much related to the other case [the first case handled by Judge Jameson] that was before the court several weeks ago. So there's this whole subtext here—and if I can just be real blunt about it—the plaintiff's firm is shaking down apartment owners and offering to do something and the Attorney General is clearly not satisfied with the way these consent judgments have been arranged."

that plaintiff provide "sufficient proof that the product causes exposure to a listed chemical to enable a finding that the warning would be truthful"].) Thus, "California regulations reflect the same intent to further settlement and public enforcement by requiring 'adequate information from which to allow the recipient to assess the nature of the alleged violation.' " (*Yeroushalmi, supra,* 88 Cal.App.4th at p. 750.)

Having said that, the *Yeroushalmi* court was thus in position to administer the coup de grâce. The forms in *Yeroushalmi* were "conclusory, fact-bereft, boilerplate" constituting nothing more than a "pro forma notice that the citizen intends to sue in 60 days for any violation relating to tobacco smoke or cigars that discovery *might* turn up." (*Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 750, italics added.) The notices "simply regurgitate[d] the language of the regulation, without stating the most basic facts to describe the nature of the violation." (*Ibid.*) As such they did not "provide adequate information to allow the assessment of the nature of the alleged violation." (*Ibid.*)

We will grant the notices here (particularly the global notice) would appear to be of a higher level than those in *Yeroushalmi.* Graham & Martin obviously spent more time on its "notice macro" than Yeroushalmi did, and compiled a really comprehensive list of carcinogens that are commonly "present" . . . oh, pretty much everywhere. But at bottom the notices here are still fact-bereft boilerplate based on conjectures rather than hard evidence— what "discovery might turn up"—and absolutely of no help at all to the Attorney General in giving his office meaningful information on which to decide whether to bring a claim in the name of the public.

Let us itemize the deficiencies. One failure of the notices here is that they utterly fail the requirement that they identify each facility or source of exposure in a manner sufficient to *distinguish* those facilities or sources from others for which no violation is alleged, contrary to regulation 12903, subdivision (b)(2)(F). That is, almost all of the allegations in the notices are so broad as to be, literally, meaningless. They apply to every single building in this state. (The only arguable exception involves pools and spas—not every building has a pool or spa.)

Dried paint. Furniture. Parking lots. Wiring. Really. As the Attorney General points out in its opening brief, the global notices present a "laundry list of dozens of chemicals" and "many of the purported exposures are so unlikely as to be virtually imaginary."

The flip side of allegations which are so broad as to apply to every building are allegations for which there are no specific, individualized facts, but which depend on unverified probabilities—what the *Yeroushalmi* court characterized as things that discovery "might turn up." For example, Graham & Martin allege no facts that any specific tenants are engaged in arts and crafts using ceramic glazes made by specific manufacturers, or any specific apartments have roofs that are known, for certain, to contain asbestos, or have water fixtures made of brass, or are painted with certain brands of aerosol primers, or contain carpets which are known for certain to include certain "foams," or are cleaned with certain brands of carpet steam cleaner or have tile polished with floor polishes containing silica, or have their grounds maintained with mineral-based fertilizers or even have photocopy machines that use toner containing "carbon black respirable sized aerosols." No, it's all a matter of probabilities—the theory is that somewhere among Graham & Martin's targets there's just gotta be an apartment that fits one of those descriptions. Since the statute and regulation contemplate meaningful prelitigation review by public authorities (*Yeroushalmi v. Miramar Sheraton, supra,* 88 Cal.App.4th at p. 740), the sort of probabilistic conjecture on which these notices rely is manifestly not good enough.

A related deficiency is the piggybacking of existing *product* exposures (and warning already provided in regard to those products) into an inherently *environmental* context. Thus the notices assume that the (probable) use of a given product within an apartment (e.g., toner for a photocopy-fax machine) requires for that apartment a separate environmental warning on top of a Proposition 65 warning that the product's manufacturer has already provided. Without specific facts of specific exposures, that's not playing fair. It's just pulling a list off the Internet of products that are already covered by Proposition 65 warnings and saying—well, at least *some* of these products might be carried into an apartment, and since we don't see a Proposition 65 warning in the lobby, we get to collect attorney fees. (As the Attorney General points out, "one is left to wonder" how the plaintiffs "have any idea whether Ortho Hornet and Wasp Spray or Soco-Lynch Solvent Stripper are used in any of these properties.")

To understand just how problematic these deficiencies are, we ask the reader to put himself or herself into the shoes of the deputies in the Attorney General's office who are charged with reviewing whether the office should exercise its statutory authority to commence litigation when a Proposition 65 notice is received. If all the notice conveys is that—well, it's a building with paint, furniture and a parking lot—or if the notice is so much shotgun boilerplate covering every carcinogenic molecule currently known—then meaningful review is impossible. The Attorney General's office presumably is

concerned with what must appear to be nonfrivolous, substantively important cases, where the public interest really requires a Proposition 65 warning. We will go so far as to supply an example: Suppose there was a specific high-rise apartment where a poorly designed ventilation system sucked up air from an underground parking lot without a warning to the tenants? *That* would be a case which wouldn't apply to every other apartment, and would satisfy regulation 12903, subdivision (b)(2)(F).

 The targeting of businesses just because they have furniture and paint and electric lights is just another way of saying that the target is not meaningfully differentiated from any other business. And unless the Attorney General is given enough information to differentiate a target from pretty much everything else in the world, there is no way that meaningful review by public prosecutorial authorities can be exercised.

### C. The Challenge to the Attorney Fees

Independently of the validity of the notices, there is no way that this record can sustain total attorney fees (even after being cut by Judge Dunning in the second case) of over half a million dollars. In fact, the total attorney fees should, under the circumstances in this particular case, be de minimis.

### 1. *A Primer on Proposition 65*

 Proposition 65 was an initiative measure passed in November 1986 as the "Safe Drinking Water and Toxic Enforcement Act of 1986." Structurally, it added nine new sections (§§ 25249.5, 25249.6, 25249.7, 25249.8, 25249.9, 25249.10, 25249.11, 25249.12 and 25249.13) to the Health and Safety Code. The initiative covered two basic topics—a prohibition on contaminating drinking water and a prohibition against "knowingly and intentionally expos[ing] any individual to a chemical known to the state to cause cancer" without "first giving clear and reasonable warning" (§ 25249.6) to that individual. We are not concerned with section 25249.5, which is the part of the initiative concerned with discharges into drinking water.

The way the warning provision works is this: A department in the executive branch (the state Health and Welfare agency) publishes a list that is to be the chemicals "known to the state to cause cancer." (See Health & Saf. Code, § 25249.8 [requirement on Governor to "cause to be published a list of those chemicals known to the state to cause cancer or reproductive toxicity"].) The list is found at regulation 12000 in title 22 of the California Code of Regulations.

Interestingly enough, the first list published pursuant to the initiative contained only 29 substances. (See DeFranco, *California's Toxics Initiative: Making It Work* (1988) 39 Hastings L.J. 1195, 1202 ["When the initial list was released on February 27, 1987, however, it contained only twenty-six known human carcinogens plus three reproductive toxicants"].) A trial court decision soon required that the list be expanded to about 250 substances (*ibid.*) and today the list contains well over 600 substances.

Regulations have defined "expose" as used in Health and Safety Code section 25249.6 broadly, including inhaling and touching. Currently, California Code of Regulations, title 22, section 12102, subdivision (i) defines "expose" as "to cause to ingest, inhale, contact via body surfaces or otherwise come into contact with a listed chemical." (Though broad, the definition is not *so* broad that it includes substances that are not on the list which may increase the body's otherwise naturally present testosterone, which, ironically, *is* on the list. (See *Consumer Cause, Inc. v. Weider Nutrition Internat.* (2001) 92 Cal.App.4th 363 [111 Cal.Rptr.2d 823].)

If an item is on the list, Health and Safety Code section 25249.6 (the central warning provision) requires that there be no "knowing[] and intentional[]" exposure "without first giving clear and reasonable warning." If the section is violated, section 25249.7 (the enforcement provision) allows civil penalties *not to exceed* $2,500 per day "for each violation."

The critical part is in the burden shifting provision of Health and Safety Code section 25249.10, which states that "In any action brought to enforce Section 25249.6, the burden of showing that an exposure meets the criteria of this subdivision shall be on the defendant." Leaving aside the problem of "knowing[] and intentional[]" as an element of the statute (cf. *Nicolle-Wagner v. Deukmejian* (1991) 230 Cal.App.3d 652, 660 [281 Cal.Rptr. 494] [upholding executive branch regulation exempting foods which contain naturally occurring carcinogens because the knowing and intentional clause indicated the electorate was concerned with substances "*added* to the environment"]), the burden shifting provisions make it virtually impossible for a private defendant to defend a warning action on the theory that the *amount* of carcinogenic exposure is so low as to pose "no significant risk" (see § 25249.10, subd. (c)) short of actual trial. There is no way a defendant is going to be able to carry its burden on demurrer based on allegations in the complaint, and a defendant will probably not be able to carry that burden on summary judgment either. (See *Consumer Cause, Inc. v. SmileCare* (2001) 91

Cal.App.4th 454 [110 Cal.Rptr.2d 627] [summary judgment for defendant dental office reversed where dental office did not show by scientific evidence that the small amount of mercury in dental amalgam was 1,000 below the no observable effect level].)

Rather, in a case of a negligible, even microscopic "exposure" (say, to lead in nonfriable dried paint), it may take a full-scale scientific study to establish the amount of the carcinogen is so low that there is no need for a warning under Health and Safety Code section 25249.10. (See *Consumer Cause, Inc. v. SmileCare, supra,* 91 Cal.App.4th at p. 476 [quoting with approval from brief of amicus curiae noting that defendants " 'did not perform a quantitative risk assessment' "].) Needless to say, these provisions make the instigation of Proposition 65 litigation easy—and almost absurdly easy at the pleading stage and pretrial stages.[21]

## 2. *As Applied to Fees*

One of the reasons we quoted the notices in such length is to give readers a flavor of the absolutely generic *boilerplate* quality of the notices. Now we deal with the question of fees, which were over $540,000 even after Judge Dunning cut them down in the second action. One must ask, what did Graham & Martin actually *do?*

Let's illustrate just how little they did by illustrating just how simple it is for a hypothetical unemployed lawyer, eager to cash in on Proposition 65, to extract money from businesses using the initiative. Our scenario will basically parallel the facts of the case before us:

First, go on the Internet and find some common objects (e.g., furniture, paper, carpeting) which *may* "contain" a substance on the regulatory carcinogen list. As we have just noted, a commonplace item, like a chair, doesn't have to contain any significant amount either, even a few molecules will do. Next, call up a local chemistry professor who will tell you that, at least *in sufficient quantities*, substances in those common objects will cause cancer, and are in fact on the list. It doesn't make any difference that there may be no "significant" exposure—remember the burden will be on the defendant to prove that. This phone call to your friendly professor will allow you to file the certificate of merit; it will be particularly helpful if your chemistry

---

[21] The *Mrs. Gooch's* case, though not directly concerned with the adequacy of notice or the question of appropriate fees, is also illustrative of the ease of such litigation. Even a health food store could be sued simply for selling firewood. (And certain progesterone creams.)

professor opines that as any substance "degrades" over time (and it can be a very long time indeed given that Proposition 65 puts the burden on any issue of amounts on the defendant), it will emit a few molecules of its constituents into the air—that will allow you to claim "exposure" by inhaling or touching.

Then, extrapolate your results to some "target" business. As we have seen in this case, businesses which are centered around structures make easy targets because at the very least they are going to have paint and furniture inside, and a place to park outside. *Yeroushalmi*, for example, involved a shakedown of certain hotels and office buildings, and it is obvious from the notices here that they were used first against hotels with only the most clumsy adaptation for apartments (as shown by the references to dry cleaning facilities and nail salons, which are often found in hotels but are rare even in high-end urban high-rise apartment buildings).

Third, develop (as here) a plenary omnibus "macro" notice form which guarantees that yes, somewhere on the premises, there will be a molecule of a substance listed as carcinogenic. Then send your notice in the stentorian Wizard-of-Oz-berates-Dorothy legal style of an indictment ("You (hereinafter 'Violator') are hereby informed that you have exposed the following [long list of categories of sorts of people who might happen onto your property] to Designated Chemicals"). This notice will be intended to frighten all but the most hardy of targets (certainly any small, ma and pa business[22]) into a quick settlement when they get it. (Note, you prepare your macro first and then go looking for a target. Here, as we have already pointed out, the macro used by Graham & Martin for their notices was obviously first tested on hotel targets.)

The next step is to visit the premises and look around for any prominent Proposition 65 warning signs. If you don't see any, or if what you see is not sufficiently conspicuous in your opinion, you now have your victim in your sights. You send your macro notice. But you are smarter than to just send one notice—the Attorney General might intervene and cause any legitimately required remedial provisions to be taken without litigation, and thus steal your thunder, i.e., your fees. So you send out a slew of notices, thus overwhelming the capacity of the Attorney General to do anything meaningful in 60 days.

---

[22] Small businesses were the particular province of Trevor Law Group-style shakedowns, because such businesses would often be willing to spend around $2,000 to buy their peace rather than the same amount on an attorney to defend the case. Graham & Martin protest that they pick on bigger fish, but qualitatively the process is still the same: the use of the very process of litigation to precipitate payoffs by private businesses for alleged violations of law having no real relationship to a true public interest.

The Attorney General having been thus pinned down, you enter settlement discussions. You have the bargaining chip that Proposition 65 provides for civil penalties for up to $2,500 per day for each violation (Health & Saf. Code, § 25249.7, subd. (b)), but of course *that* can be traded for . . . fees to you. You can also hide money that goes to yourself by calling them charitable contributions to a "consumer" organization that you of course control. (See, e.g., *Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th at p. 484, fn. 9 (dis. opn. of Vogel, M., J.) [noting Web site detailing that Prop. 65 front organization entered into settlement with half the money going to the front organization as a donation and the other half going to the front organization's lawyers as attorney fees].)

Besides the stick of civil penalties that you can give up, you have a carrot as well. You can be willing—in exchange for big bucks by way of attorney fees of course—to extend to your victims the maximum future immunity for your agreement to go away. So you can (as here) be quite agreeable to giving the maximum arguable res judicata effect to the settlement; after all, if you are going to receive big fees for settling litigation based on dried paint, the defendant is going to want value for money.[23]

The point is, apart from the need to give the Attorney General and other prosecutorial authorities meaningful notice (in all the ways we have described above), bringing Proposition 65 litigation is so absurdly easy that the sorts of attorney fees on which the parties settled here are objectively unconscionable. More than half a million dollars for walking into a group of apartments (and there is evidence that some of that might have been falsified!) looking for signs (and—just to give the exercise a little verisimilitude, also looking for

---

[23] Other jurists have already noticed this process, at least as it played out in litigation applied to dentists in the *SmileCare* case. The irony is that, as in *SmileCare*, there is a far better case that people do need to be warned of mercury in their tooth fillings than be warned of the fact that a location has a parking lot and there is wiring on the premises:

"Here is how it works . . . . Pick a dentist or doctor, any dentist or doctor (but preferably one with a deep pocket.) Visit the dentist's or doctor's office. If you don't see Proposition 65 warning signs on the walls or counters, go to the nearest courthouse, file a complaint, allege a failure to warn, and ask for $2,500 for each day the dentist or doctor has failed to give the required warnings. . . . [¶] The dentist or doctor won't be able to get out of the case by a motion for summary judgment. . . . What's a dentist or doctor to do? Settle with the plaintiff, of course. Save the cost of the assessment. Save the legal fees. Get rid of the case." (*Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th at p. 478 (dis. opn. of Vogel, M., J.), fn. omitted.)

In quoting Justice Vogel's dissent we express no opinion that the *SmileCare* case was incorrectly decided. In fact, for purposes of our analysis of the attorney fee issue (see below) we assume that *SmileCare* was correctly decided. Even so, Justice Vogel's observations about the ease of bringing Proposition 65 litigation are trenchant and accurate, independent of the merits of the majority opinion.

pools and spas) and then serving a boilerplate, form notice based on such ubiquitous things as paint and parking deserves only the most minimal compensation.

But there is yet an even darker side to *this* settlement. Notice that the large amount of fees in this case are earned at the *direct expense of the public interest*. As the Attorney General noticed, it is an "enterprise that only provides immunity for businesses and remuneration for private attorneys." There is no way that the trade group here, for example, would have ponied up a half-million dollars if, for example, the plaintiffs had sought a large amount of civil penalties payable to genuinely deserving entities (let's assume that a national cancer charity which gave no benefit to the plaintiffs fit that category) and not themselves. That might actually give the defendants an incentive to take the case to trial. If that happened, we might not have a settlement providing maximum future immunity for the defendants, but a real fight between the parties, with the potential that the trial court would have a genuine confrontation with the factors (specified in subdivision (b)(2) of Health & Saf. Code, § 25249.7) governing the amount of penalties that is appropriate for, for example, the sin of not telling tenants that dried paint may contain all sorts of nasty things.

So the large attorney fee award here is the worst of all possible worlds. The plaintiffs are rewarded for shaking down the defendants for ubiquitous trivia, but the settlement itself contains provisions that attempt to preclude future Proposition 65 enforcement by the Attorney General in cases where it genuinely might be justified, say, our hypothetical high-rise with the defective ventilation system bringing up the exhaust from the underground parking lot into the higher levels of the building.

Again, let's take our hypothetical nontrivial case, the high-rise with the faulty ventilation system. If, for sake of argument, there is such a structure among the 1,000-plus structures involved in this case, the poor tenants are hardly going to be served by the warnings *this* settlement provides. They might see the Proposition 65 warning in the hallway or lobby, and if they are real curious, they might log onto the Web site and—what do they learn? They learn that foam in their furniture and the wires connecting the very computer they use to log on with to their Internet provider might contain carcinogens. Big deal. The warning they receive is meaningless to them. The one risk that they *ought* to know about—that the air they are breathing is coming straight from the exhaust of the diesel truck idling in the basement while deliveries are being made—is missing.

In sum, this settlement represents the perversity of a shakedown process in which attorney fees are obtained by bargaining away the public's interest in warnings that might actually serve some public purpose. Thus even though Judge Dunning (correctly) reduced the attorney fees in the second case, even that reduction was predicated on the idea that the settlement served a genuine public interest. Given the ease with which it was brought, and the absolute lack of any real public benefit from telling people that things like dried paint may be slowly emitting lead molecules or that parking lots are places where there might be auto exhaust, instead of $540,000, this legal work merited an award closer to a dollar ninety-eight.[24]

Our conclusion is confirmed by reference to the seven traditional factors used to gauge attorney fee awards in private attorney general cases. (See Code Civ. Proc., § 1021.5; *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].)

(1) *The novelty and difficulty of the questions involved.* Proposition 65 litigation of the sort we have *in this case* is absurdly easy given the burden shifting provisions of Health and Safety Code section 25249.10. Basically, it is: Get your macro, send your notice, file suit, and if the defendant doesn't want to spend money to fight you *at trial* demonstrating that dried paint is not *substantially* carcinogenic, collect money.

(2) *The extent to which the litigation precludes other employment by the attorneys.* As we have seen, the whole trick is to develop a formidable macro listing the carcinogens which might or probably appear in commonplace items and that's about it, other than a form complaint and the formality of having an assistant go looking for Proposition 65 warning signs. After you have developed your macro, your form complaint, and sent your assistant out looking for the absence of signs, you still have plenty of time for other work (maybe even work on behalf of a real client rather than yourself).

(3) *The contingent nature of the fee award.* These cases are vehicles by which attorneys primarily seek to recover fees for themselves, not recover damages for real litigants.

---

[24] We order the *dismissal* of both actions because of the insufficient notices and agree with the Attorney General that the attorney fees awarded in the first action were grossly excessive. The Attorney General does not specifically attack the reduction of the fees in the second action from around $120,000 to some $35,000, though it should be clear from our analysis that even $35,000 is way too much under the circumstances of this case. As to whether, after our judgment, there is any residual obligation on the part of the trade group to pay even the $35,000, we leave the parties in pari delicto.

(4) *The fact that an award might ultimately fall on the taxpayers.* No, but the award *does* represent a needless expense imposed on businesses in California without any corresponding genuine public benefit, and the costs incurred by those businesses ultimately means those businesses pay less taxes and employ less people than otherwise would be the case.

(5) *The fact that the attorneys received public and charitable funding.* Not applicable.

(6) *The fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed.* In this case the whole point of the litigation is that the fees inure to the benefit of the attorneys. (As Anthony G. Graham proudly proclaimed at oral argument; see fn. 1.)

(7) *The fact that there were two law firms with an equal share in the success of the litigation.* Not applicable.

Of course, we are not saying that in a *genuine,* nonfrivolous case, based on something other than ubiquitous trivia, fees awarded to a private enforcer should not be closer to the going rate in light of the usual factors. For example, we would have no qualms that a case like *SmileCare* would merit something on the magnitude of normal fees in public interest cases. After all, dental fillings are placed in your mouth, and it is at least intuitive that they might leak. That's a whole lot different than dried paint on your wall. But when litigation is as easy as shooting the side of a barn, drawing circles around the bullet holes and them claiming you hit the bull's eye (to credit a metaphor used in Justice Vogel's dissenting opinion in *Consumer Cause, Inc. v. SmileCare, supra,* 91 Cal.App.4th at p. 488, fn. 12), only the most minimal attorney fees are conscionable.

### D. The Piggyback

*Section 17200 Action*

■ It is now settled that unfair competition law claims (see Bus. & Prof. Code, § 17200) which are predicated on Proposition 65 warning violations must be dismissed if the underlying Proposition 65 claim is dismissed. (See *In re Vaccine Cases, supra,* 134 Cal.App.4th 438, 459.) Accordingly, Graham & Martin's section 17200 claims fall with the failure of their Proposition 65 claims.

## IV. DISPOSITION

The consent judgments in 04CC00589 and 04CC00686 are reversed, with directions to enter judgments dismissing each case. Because we only opine on the notices and the attorney fees, our decision is not res judicata for any future Proposition 65 litigation against any of the trade group members brought by the Attorney General, or any party other than plaintiff or any party represented by Graham & Martin.

Rylaarsdam, J., and Fybel, J., concurred.

On April 20, 2006, the opinion was modified to read as printed above. The petition of plaintiffs and respondents for review by the Supreme Court was denied July 19, 2006, S143221.