[No. B169636. Second Dist., Div. Eight. July 6, 2006.]

CONSUMER ADVOCACY GROUP, INC., et al. Plaintiffs and Appellants,
v.
KINTETSU ENTERPRISES OF AMERICA et al., Defendants and Respondents.

48

**COUNSEL**

Yeroushalmi & Associates, Daniel D. Cho, Reuben Yeroushalmi and Daniel J. Hartman for Plaintiff and Appellant Consumer Advocacy Group, Inc.

Graham & Martin, Anthony G. Graham and Michael J. Martin for Plaintiffs and Appellants Consumer Defense Group and the McKenzie Group.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Theodora P. Berger, Assistant Attorney General, and Edward G. Weil, Deputy Attorney General, for County as Amicus Curiae on behalf of Plaintiffs and Appellants.

Weston Benshoof Rochefort Rubalcava MacCuish, Kurt Weissmuller and Stephanie A. Jones for Defendants and Respondents Hotel Sofitel, Accor North America and Kintetsu Enterprises Company of America.

Gibson, Dunn & Crutcher, Scott A. Kruse, Patrick W. Dennis and Stephanie A. Hartley for Defendants and Respondents Wyndham International, Inc., and Patriot American Hospitality, Inc.

Jeffer, Mangels, Butler & Marmaro, Jeffrey K. Riffer, Malcolm C. Weiss and David P. Waite for Defendant and Respondent California Hotel and Lodging Association Members.

## OPINION

**COOPER, P. J.**—In 2002, the Legislature required judicial review of Proposition 65 settlements because of concern that "in some cases, defendants and private plaintiffs have found common ground by entering into a settlement that does not provide any real protection to the public in the event of a violation, but does provide compensation to the plaintiffs' attorneys." (Sen. Rules Com., Analysis of Sen. Bill No. 471 (2001–2002 Reg. Sess.) as amended Sept. 13, 2001, pp. 3–4.) The Legislature sought to prevent settlements "which simply result ion [*sic*] inadequate public warning in exchange for payments of attorney's fees." (Sen. Rules Com., Analysis of Sen. Bill No. 471 (2001–2002 Reg. Sess.) as amended Sept. 13, 2001, p. 3.)

Judicial review disclosed the accuracy of the Legislature's concerns. The admission of "no violation" did not deter litigation or settlement (*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1179 [34 Cal.Rptr.3d 258] (*Johnson & Johnson*)), and settlements were entered at the "*direct expense of the public interest.*" (*Consumer Defense Group v. Rental Housing Industry Members* (2006) 137 Cal.App.4th 1185, 1218 [40 Cal.Rptr.3d 832] (*Consumer Defense Group*).)

This appeal reflects additional defects both in the process of negotiating Proposition 65 settlements and the substantive test used by the trial court to decide whether to enter the parties' settlement as the court's judgment. In this case, some of the respondents were promised that for "one low settlement amount" they could buy relief "regardless of the chemicals involved and

regardless of who might have brought a claim against you or might bring a future claim against you." The only requirement was that they join a trade organization and ask to be sued. In evaluating the settlement agreements, the court failed to evaluate whether the judgments served the public interest. The court should not " 'surrender its duty to see that the judgment to be entered is a just one' " when it approves a consent judgment. (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [268 Cal.Rptr. 284, 788 P.2d 1156].) We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

*Consumer Advocacy Group First Sued Hotels Based on Secondhand Smoke*

Eight years ago, Consumer Advocacy Group (CAG) first served hundreds of hotels, many of which are respondents in this appeal, with notices alleging violations of Proposition 65 based on secondhand smoke. CAG's first set of notices were found invalid in *Yeroushalmi v. Miramar Sheraton* (2001) 88 Cal.App.4th 738, 743 [106 Cal.Rptr.2d 332] (*Miramar*). While that appeal was pending, CAG served a second set of notices and, subsequently, a third set of notices. In *Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America* (2005) 129 Cal.App.4th 540 [28 Cal.Rptr.3d 775] (review granted Sept. 28, 2005, S135581), we considered the validity of CAG's second and third sets of notices. That case is pending in our high court.

*Consumer Defense Group Then Expanded the Secondhand Smoke Litigation*

Counsel for Consumer Defense Group (CDG) and The McKenzie Group (TMG) took over in the midst of the CAG litigation. (It is unclear why some lawsuits are brought by CDG, some by TMG, and some by both plaintiffs.[1] However, for purposes of this appeal they are indistinguishable, and we refer to them collectively as CDG.) While the CAG litigation was pending, CDG sent notices similar to CAG's alleging violations of Proposition 65 based on secondhand smoke. The trial court found CAG's and CDG's initial notice to be almost identical.[2] In 2002, when settlement negotiations were underway

---

[1] For example, the notice served on Pacifica Hotels was served by CDG but purported to cover all violations of Proposition 65 "currently known to The McKenzie Group."

[2] In the context of a class action lawsuit, courts have warned that there are incentives for defendants to settle with the most ineffective plaintiffs' attorneys and for plaintiffs' attorneys to sell out the class in return for generous fees. (*Reynolds v. Beneficial Nat. Bank* (7th Cir. 2002) 288 F.3d 277, 282.) One commentator has noted that "[n]othing better facilitates collusion than the ability on the part of the defendants to choose the counsel who will represent the plaintiff class. To be sure, even if so chosen, plaintiffs' counsel could behave responsibly. But the dynamics for collusion are set in motion when such a selection process is possible." (Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action* (Oct. 1995) 95 Colum. L.Rev. 1343, 1378.)

between CDG and the hotels, CDG sent an amended notice of violations to the following chains of hotels: Wyndham International, Inc., Patriot American Hospitality, Inc., La Quinta Corporation, La Quinta Inns, Inc., La Quinta Properties, Inc., Pacifica Hotel Company, Doubletree Hotels, Embassy Suites, Hampton Inn, Red Lion, Club Hotel, Promus Hotel Corporation, Hilton Hotels Corporation, Hotel Sofitel, Accor North America, and Kintetsu Enterprises Company of America. (Collectively, Hotel Respondents.)

The amended notice covered not only "secondhand tobacco smoke," but also "cleaning supplies and related activities," "on-site construction activities," "furnishings, hardware and electrical components," "personal hygiene and medical supplies," "combustion sources," "office and art supplies and equipment," "landscaping supplies and pesticide treatment," "food and beverage service," "transportation-related exposures," "equipment and facility maintenance," "recreation, swimming pools, hot tubs and beaches," and "retail sales." (Capitalization omitted.)

Counsel for Hilton Hotels explained that "throughout these years of trying to get this thing resolved [with CAG], we had a new plaintiff who came in the picture. The new plaintiff said we would like to work out a scheme which would benefit the public, and help you get these cases settled. [¶] We jumped at the chance." It appears that CAG attempted to participate in some of the settlement proceedings resulting in the consent judgments between CDG and the hotels, but was excluded from the negotiation sessions. A letter from counsel informed CAG that it was not a party, and therefore was not invited to participate.

*Five Hotel Consent Judgments*

CDG and Hotel Respondents negotiated five separate stipulated consent judgments, and the judgments were approved by the court (Hotel Judgments).[3] These judgments covered five different types of exposure (reduced from the original agreement covering many other types of exposure). For example, the Wyndham judgment covers "tobacco products, tobacco smoke and secondhand tobacco smoke (and their constituent chemicals), motor vehicle exhaust (and its constituent chemicals), acetaldehyde and

---

[3] One judgment covers Wyndham International, Inc., Patriot American Hospitality, Inc., and related entities. This judgment covers 38 hotels. Another judgment covers La Quinta Corporation, La Quinta Inns, Inc., La Quinta Properties, Inc., and related entities. This judgment covers 18 hotels. The judgment covering Pacifica Hotel Company covers 17 properties. The judgment covering Kintetsu Enterprises Company of America covers three properties. (Collectively, Hotel Judgments.)

formaldehyde (based on their presence in furnishings, including off-gassing into the air), acrylamide (based on its presence in baked and fried foods), benzo(a)pyrene and other chemicals produced from barbecuing or broiling meats and fish, and lead (based on its presence in electrical components) . . . ."

The following provisions are similar in each of the five consent judgments. The consent judgments describe the status of CAG's litigation as follows: "Since approximately 1998, various organizations have sent 60-day notices to a number of industries, including the hotel industry, throughout the State alleging violations of Proposition 65 and Section 17200 et seq. of the Business and Professions Code (the 'Unfair Competition Act'). The notices, in general, were based on alleged exposures to consumers, customers, guests, employees and members of the general public to tobacco and/or tobacco products and/or secondhand tobacco smoke. A trial court in Los Angeles County Superior Court ruled that the 60-day notices in these cases were inadequate and dismissed the cases. The California Court of Appeal upheld the lower court's ruling on appeal.

"The second wave of cases, based on new 60-day notices, include cases against hotels, gas stations, mini marts, and drugstores, among others, and allege secondhand smoke exposures as well as exposures to tobacco and/or tobacco products. . . . [¶] Most of the cases in JCCP 4182 have been filed by Consumer Advocacy Group ('CAG'). Defendant's Covered Properties were the subject of a lawsuit brought by CAG . . . . The CAG Lawsuit . . . alleged violations of both Proposition 65 and the Unfair Competition Act. [¶] On March 20, 2002, the Court granted a motion for judgment on the pleadings filed by Defendant, dismissing the CAG Lawsuit in its entirety with prejudice due to inadequate notice. CAG is appealing the dismissal. In addition, since the dismissal, both CAG and Plaintiff have filed new 60-day notices and new or amended complaints against the Defendant. . . . Plaintiff's Notice includes allegations dating back to the same time period covered by the CAG Lawsuit."

The consent judgment also refers to CAG as follows: "In order to avoid continued and protracted litigation, Plaintiff and Defendant (collectively, the 'Parties') wish to resolve certain issues raised by the Notice and the CDG Lawsuit and the CAG Lawsuit, pursuant to the terms and conditions described herein. . . . In addition, in entering into this Consent Judgment, both Plaintiff and Defendant recognize that this Consent Judgment is a full and

final settlement of all such Noticed Chemicals claims that were raised or that could have been raised in the CAG Lawsuit, because the settlement of the CDG Lawsuit moots any and all claims in the CAG Lawsuit and/or operates as res judicata and/or collateral estopp[e]l to bar any and all such claims in the CAG Lawsuit. This includes all such claims related to tobacco products, tobacco smoke and secondhand tobacco smoke, motor vehicle exhaust, acetaldehyde and formaldehyde (based on their presence in furnishings, including off-gassing into the air), and lead (based on its presence in electrical components) brought, or which could have been brought, by Plaintiff and CAG under Proposition 65, as well as all claims brought, or which could have been brought, by Plaintiff and CAG under the Unfair Competition Act. Plaintiff and Defendant also intend for this Consent Judgment to provide, to the maximum extent permitted by law, res judicata protection for Defendant against all other claims based on the same or similar allegations as to the Noticed Chemicals." (Italics omitted.)

"Defendant's willingness to enter into this Consent Judgment is based upon the understanding that this Consent Judgment will fully and finally resolve all claims related to tobacco products, tobacco smoke and secondhand tobacco smoke (and their constituent chemicals), motor vehicle exhaust (and its constituent chemicals), acetaldehyde and formaldehyde (based on their presence in furnishings, including off-gassing into the air), and lead (based on its presence in electrical components) brought both by Plaintiff and by CAG, and that this Consent Judgment will have res judicata effect to the extent allowed by law with regards to both the Proposition 65 allegations and the Unfair Competition Act allegations. Therefore, Defendant expressly reserves the right to withdraw from this Consent Judgment at any time and for any reason up until such time as the Consent Judgment becomes final, including any litigation relating to this Consent Judgment as well as any and all appeals relating to the Consent Judgment. [¶] Defendant further expressly reserves the right to withdraw from this Consent Judgment at any time and for any reason up until any litigation by CAG or any other third party regarding the CAG Lawsuit and/or the validity of this Consent Judgment is fully and finally resolved in Defendant's favor, including any and all appeals." (Italics omitted.)

The following was among the provisions describing the finality of the judgment: "The Judgment is a full and final judgment with respect to any claims regarding the Noticed Chemicals asserted in the CDG Lawsuit and the CAG Lawsuit against the Released Parties and each of them, and the Notice against Defendant regarding the Covered Properties, including, but not

limited to: (a) claims for any violations of Proposition 65 by the Released Parties and each of them including claims arising from consumer product, environmental and occupational exposures to the Noticed Chemicals, wherever occurring and to whomever occurring, through and including the date upon which the Judgment becomes final, including any and all appeals; (b) claims for violation of the Unfair Competition Act . . . including, but not limited to, Plaintiff and CAG's asserted right to injunctive and monetary relief. . . ." The judgment further purports to release defendant from liability with respect to "matters regarding the Noticed Chemicals alleged in the CDG Lawsuit and the CAG Lawsuit" and forever discharge defendant and its future owners from liability.

Two pages discuss the preclusive effect of the judgment. According to the judgment, it "[c]onstitutes full and fair adjudication of all claims against Defendant, including, but not limited to, all claims set forth in the CAG Lawsuit, because of the preclusive effect of the settlement of the CDG claims on the CAG claims and because CAG is a party before this Court in JCCP 4182, based upon alleged violations of Proposition 65 and the Unfair Competition Act, as well as any other statute, provision of common law or any theory or issue which arose from the alleged failure to provide warning of exposure to tobacco products, tobacco smoke and secondhand tobacco smoke (and their constituent chemicals) . . . ."

The judgment provides for injunctive relief described as clear and reasonable warnings. "Defendant has been in compliance with Proposition 65 warning requirements relating to environmental and occupational exposures because it posts, and has posted, warnings at the Covered Properties. With regard to the alleged exposures to the Noticed Chemicals, Defendant either has posted and agrees to continue to maintain, or will post within ninety (90) days following the entry of Judgment, a warning . . . at the primary points of entry at each of the Covered Properties and on the employees' bulletin board or inside of the employees' handbook. . . ." The warning indicates that the facility contains chemicals known to cause cancer or birth defects and that a brochure is available at the front desk.

With respect to secondhand smoke, the hotel chains agreed to place a sign at "every location at each of the Covered Properties where smoking is permitted, including either inside of any guestroom that is designated for smokers or at the elevator landing area on each floor with designated

smoking rooms." After stating that they were in compliance because they had already posted a warning, the hotel chains also agreed to post warnings in gift shops regarding exposure to tobacco products.

*CDG's Settlement with CHLA*

The court also approved a separate stipulated settlement between CDG and California Hotel & Lodging Association (CHLA), which included hundreds of hotels (CHLA Judgment). According to its chief executive officer, James Abrams, CHLA is an industry trade association with over 1300 members who own and operate lodging establishments. According to counsel for CDG, "the trade association only got into this matter after these cases had been, the hotel industry cases had been in litigation for a number of years. [¶] We had been litigating against the major franchises for approximately two years when we were approached by the trade association."

CHLA negotiated with CDG and then sent out information regarding the settlement in a memorandum identified as a "red alert": "Our objective is to create a court-approved settlement procedure wherein payment of a low negotiated settlement amount and low attorneys' fees and costs will effectuate a 'global' resolution that will benefit every California innkeeper who elects to participate in it." ***"CH&LA is extremely pleased to inform the industry that we have accomplished the goal of negotiating a settlement!*** The details of the global settlement negotiated on your behalf—if you choose to take advantage of it—are described below." (Original italics and boldface.) The "red alert" further indicated the benefits included "[c]omprehensive relief from all past Prop. 65 claims for one low settlement amount" and indicated such relief was available "regardless of the chemicals involved and regardless of who might have brought a claim against you or might bring a future claim against you."

According to the "red alert," "[t]his settlement is available *only to CH&LA members in good standing* (i.e., those whose dues payments are current)." "Once an innkeeper notifies CH&LA that he/she intends to participate in the settlement . . . the lawyers at JMBM will confirm that it has no conflicts of interest in representing you, and then proceed to send you a standard *engagement letter* for this representation, a *joint defense agreement* and, if needed, a *conflicts waiver* form indicating that you have agreed to participate with other CH&LA members in this settlement." "Upon confirmation of your participation, the innkeeper will then be asked to complete a detailed questionnaire that will enable preparation of the necessary paperwork in a

way that is specifically focused on each of the innkeeper's properties." **"These documents will be required to prepare a necessary new comprehensive Prop. 65 60-day notice of intent to sue from Graham & Martin, which will be sent to you."** (Original italics and boldface.)

*CHLA Judgment*

The CHLA Judgment is similar to the Hotel Judgments, except the scope of the CHLA Judgment is substantially broader.[4] In addition, the CHLA Judgment, in contrast to the Hotel Judgments, "excludes" numerous chemicals.[5] In discussing injunctive relief, the CHLA Judgment states "Defendants, or many of them, maintain they have been in compliance with Proposition 65 warning requirements because they post, and have posted, Proposition 65 warnings at the Covered Properties."

Similar to the Hotel Judgments, the CHLA Judgment provides: "This Court finds, and the Parties agree, that entry of this Stipulated Consent Judgment and providing the warnings and brochure comprising the Compliance Methodology specified above in this Section 3 shall satisfy all requirements and

---

[4] It covers all of the following chemicals: "tobacco products, tobacco smoke, secondhand tobacco smoke, their constituent chemicals and their by-products including nicotine; benzene, carbon monoxide, diesel exhaust, gasoline exhaust and their constituents (from motor vehicle exhaust and fueling operations); acetaldehyde, formaldehyde, benzene, vinyl chloride, toluene, diisocyanate, dichloromethane, hexavalent chromium,1,3 butadiene, di(2-ethylhexyl) phthalate, vinyl chloride, lead, cadmium, nickel and nickel compounds (based on their presence in furnishings, metal hardware and electrical components); acetonitrile and acrylamide, (based on its presence in baked and fried foods); DDT; polychlorinated biphenyls, mercury and methyl mercury and their compounds (based on their presence in fish and sea food); benzo(a)pyrene and other chemicals (produced from grilling, barbecuing or broiling meats, fowl and fish); chloroform and bromoform (based on their presence to clean and sanitize pools and spas); ethylene oxide, 1,4 dioxane, butylated hydroxyanisole, chlorinated solvents, sodium hypochlorite, hydrochloric acid, benzene, tetrachloro ethylene, dichloromethane, toluene and chlorine (based on their presence in general purpose and specialty cleaning products); paradichlorobenzene and formaldehyde (based on its presence in bathroom odor cakes); toluene, benzene and crystalline silica (based on their presence in solvent-based, latex or water-based paints, adhesives and coatings); arsenic trioxide, resmethrin, triforine, myclobutinil, p-dichlorobenzene, mancozeb, cadmium, lead, mercury, and cobalt oxide (based on their presence in pest control and landscaping compounds); and perchloroethylene (related to its presence in dry cleaned garments and dry cleaning facilities)."

[5] The CHLA Judgment defines excluded chemicals as follows: "soots and tars, creosotes, mineral oils (related to their presence in certain combustion sources using natural gas, propane, sterno fuels, candles and matches); lead acetate, hexachloro-cyclohexane isomers (related to their presence at salons); lead and lead compounds and di(2-ethylhexyl) phthalate (related to their presence in exercise rooms); anabolic steroids, testosterone, streptomycine sulfate, 2,3,7,8-tetrachlorodibenzo-para-dioxin, polychlorinated dibenzo-p-dioxins (meats); alfatoxins (based on their presence in cereals, grains and peanut butter)."

obligations under Proposition 65 with respect to any and all actual environmental, occupational, and consumer product exposures . . . to the Noticed Chemicals. The Court further finds that the Compliance Methodology is clear and reasonable."

*Opposition and Hearings*

Both CAG and the Attorney General opposed the six settlements. The court described the CHLA deal as "a friendly deal" and the court expressed concern that it may be "too cozy." Nevertheless, the court approved the settlements as amended and entered them as the court's judgments. With respect to the Hotel Judgments the court found no collusion. "I have nothing but conclusory and somewhat inflammatory statements on that subject, which I'm not considering as having a great deal of merit." The court made no similar finding with respect to the CHLA Judgment. CAG appealed from the judgments and we denied respondents' motion to dismiss on the basis that CAG is not a party to the litigation. The Attorney General filed a brief of amicus curiae.

## DISCUSSION

Threshold issues include standing and justiciability. We begin there and then consider the crux of the parties' disagreement—whether a trial court is required to consider the public interest when it evaluates a proposed consent judgment brought by a private plaintiff who is suing on behalf of the public interest.

### I. *CAG Has Standing to Appeal*

Respondents contend CAG lacks standing to appeal because it is not a party to the settlement agreements that resulted in the judgments. If that were the only relevant fact, we would agree. But respondents fail to mention the following facts: Respondents negotiated the settlement of CAG's litigation by including an explicit finding that each judgment "[c]onstitutes full and fair adjudication of . . . all claims set forth in the CAG Lawsuits." Respondents also persuaded the trial court to predetermine the estoppel effect of its judgments, thereby purporting to bar CAG from future litigation.[6]

---

[6] Each consent judgment contains provisions similar or identical to the following: (1) the judgment "is a full and final settlement of all such Noticed Chemicals claims that were raised or that could have been raised in the CAG Lawsuit, because the settlement of the CDG Lawsuit moots any and all claims in the CAG Lawsuit and/or operates as res judicata and/or collateral estopp[e]l to bar any and all such claims in the CAG Lawsuit. This includes . . . all claims brought, or which could have been brought, by Plaintiff and CAG under the Unfair Competition Act." (2) "Entry of judgment by the Court . . . [c]onstitutes full and fair

Code of Civil Procedure section 902 affords an aggrieved party standing to appeal. CAG is an aggrieved party within the meaning of this statute even though it is not named as a party to the consent judgments, because the consent judgments purport to resolve CAG's lawsuits. (*Harris v. Alcoholic Bev. etc. Appeals Bd.* (1966) 245 Cal.App.2d 919, 922 [54 Cal.Rptr. 346] ["[t]he test in this regard is whether the party seeking to appeal has an interest which appears on the record"]; *Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295 [50 Cal.Rptr.2d 493] [a person bound by res judicata has standing to appeal]; *Life v. County of Los Angeles* (1990) 218 Cal.App.3d 1287, 1292 [267 Cal.Rptr. 557] ["A party who would be bound by the doctrine of res judicata, whether or not a party of record, is a party sufficiently aggrieved to assert appellate rights."].) The provisions that purport to settle CAG's lawsuits and preclude CAG from subsequent litigation afford CAG standing to appeal.[7]

## II. *Justiciability*

*Johnson & Johnson, supra,* 132 Cal.App.4th at page 1179, which vacated a consent judgment resolving Proposition 65 litigation where the plaintiff had agreed that the covered products " 'fall within the "no significant risk level" provided under Proposition 65,' " was decided after this case. But the questions posed by the trial court, which respondents never answered, raise similar concerns.[8] It is not clear whether there was a dispute between CDG and the hotels concerning compliance with Proposition 65, i.e., whether the

---

adjudication of all claims against Defendant, including, but not limited to, all claims set forth in the CAG Lawsuits, because of the preclusive effect of the settlement of the CDG/TMG claims on the CAG claims and because CAG is a party before this Court in JCCP 4182, based upon alleged violations of Proposition 65 and the Unfair Competition Act." (3) The entry of judgment "[d]ismisses the CAG Lawsuits with prejudice as against Defendant, or alternatively, enters judgment in favor of Defendant in the CAG Lawsuits."

[7] Because the judgments must be reversed on other grounds, we need not decide whether CAG may challenge the adequacy of CDG's notice where the purpose of the notice is to assist the defendants in identifying and curing the alleged violation and to assist the Attorney General in determining whether to intervene or take over the lawsuit. (*Miramar, supra,* 88 Cal.App.4th at p. 748.)

[8] With respect to the CHLA Judgment, the trial court anticipated the *Johnson & Johnson* decision. In a tentative opinion, the court requested the following information, "In connection with the proposed warnings that would be given under the terms of the proposed settlement, the Court is interested in knowing how many of the named defendants currently have generic warnings posted at their facilities, and when such generic warnings were first posted. This information should be provided as to each facility intended to be subject to the terms of the consent judgment requested in this case. The Court also requests that each settling defendant provide information concerning any prior Prop. 65 case to which it was a party, the nature of the alleged violations, and the present status of any such cases. Where cases have been settled, the Court requests a summary of the terms of any settlement and/or consent judgment entered."

Counsel for CHLA responded as follows: "[a]t this time, I cannot detail for the Court how many of the 248 lodging establishments participating in this settlement have actually posted Proposition 65 warnings, what language has been used in those warnings, or exactly when

hotels were violating the law—or whether instead, the litigation was, as the Attorney General suggests, merely an effort to obtain a judicial permit sanctioning the warnings the hotels already were providing.[9]

While the record lacks the information necessary to determine justiciability with respect to many of the chemicals, it is clear that the "excluded chemicals" in the CHLA Judgment, chemicals the parties agree "do not give rise to an exposure which requires a Proposition 65 warning" do not represent a justiciable controversy. There is no distinction between that definition and products that " 'fall within the "no significant risk level" provided under Proposition 65,' " the admission found fatal to justiciability in *Johnson & Johnson, supra,* 132 Cal.App.4th at page 1179.

III.  *The Trial Court Must Find That a Proposition 65 Consent Judgment Is Just and Serves the Public Interest*

A.  *Standard of Review*

CAG and respondents agree that the consent judgment should be reviewed for abuse of discretion just as in class action litigation. For example, one respondent cites *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145 [102 Cal.Rptr.2d 777], for the following proposition: " '[o]ur task is limited to a review of the trial court's approval for a clear abuse of discretion. [Citations.] We will not "substitute our notions of fairness for those of the [trial court] and the parties to the agreement.

---

those warning[s] were posted. I do understand that in response to the plaintiffs' 60-day notices, and based on our advice and directives to our clients, many if not all of the participating lodging establishments began posting an 'interim' Proposition 65 warning for environmental and/or second-hand tobacco smoke, pending this Court's approval of the more detailed and specific warning system set forth in the Consent Judgment." Counsel's declaration, however, is devoid of the specific facts necessary to determine if, prior to CDG's 60-day notices, the hotels had already complied with Proposition 65, either on their own or as a result of other litigation.

[9] While we find evidence that some signs were posted prior to CDG's litigation, counsel for Hilton Hotels was asked whether notices were up when the CDG cases were filed and answered "in some instances, yes; in some instances, no . . . ." According to a declaration of counsel in support of approval of the Wyndham International, Inc., and Patriot American Hospitality, Inc., judgment, counsel had several conversations with Ruben Yeroushalmi, counsel for CAG. "During these conversations, *I advised Mr. Yeroushalmi that warning signs compliant with Proposition 65 had been posted at the various hotel properties* and offered to post tobacco smoke signs similar to those provided for in the [Proposed] Stipulated Consent Judgment." (Italics added.) Counsel for the other hotels provided similar declarations. At oral argument in this court, counsel for hotels suggested that notices were posted as a result of CAG's lawsuit.

[Citations.]" . . . " 'So long as the record . . . is adequate to reach "an intelligent and objective opinion of the probabilities of success should the claim be litigated" and "form an educated estimate of the complexity, expense and likely duration of such litigation, . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise," it is sufficient.' [Citations.] Of course, such an assessment is nearly assured when all discovery has been completed and the case is ready for trial. [Citations.]" ' "

In a class action lawsuit, the court undertakes the responsibility to assess fairness in order to " ' " 'prevent fraud, collusion or unfairness to the class, the settlement or dismissal of a class action . . . .' " ' " (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1800 [56 Cal.Rptr.2d 483].) "The purpose of the requirement [of court review] is 'the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties.' " (*Id.* at p. 1801; see *Officers for Justice v. Civil Service Com'n, etc.* (1982) 688 F.2d 615, 624; *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 240 [110 Cal.Rptr.2d 145] [same].)

Both class action litigation and Proposition 65 litigation affect the interests of unrepresented persons—either unrepresented class members or unrepresented members of the public. Given the similarities between the trial court's obligations in reviewing a Proposition 65 consent judgment and a class action consent agreement, the standard of review on appeal should be analogous. So long as the trial court adheres to correct legal criteria, our review is circumscribed and deferential; this court should accord "[g]reat weight" to the trial court's judgment and review it only for an abuse of discretion. (*7-Eleven Owners for Fair Franchising v. Southland Corp., supra,* 85 Cal.App.4th at p. 1145.)[10] "To the extent that it appears the trial court's decision was based on improper criteria or rests upon erroneous legal assumptions, these are questions of law warranting our independent review." (*Wershba v. Apple Computer, Inc., supra,* 91 Cal.App.4th at p. 235.)

B. *The Parties Apply the Wrong Legal Test*

Discerning the legal requirements for approval of a Proposition 65 consent judgment is a question of law, subject to de novo review. (*Foster v. Snyder*

---

[10] As hotels and CDG acknowledge, in *Ingredient Communication Council, Inc. v. Lungren* (1992) 2 Cal.App.4th 1480, 1494 [4 Cal.Rptr.2d 216], the court found that the determination of whether a warning complies with the requirements of Proposition 65 is reviewed for substantial evidence. In approving a consent judgment, a trial court must also make findings that a warning complies with the chapter. (Health & Saf. Code, § 25249.7, subd. (f)(4)(A).) Because we reverse on other grounds, we need not further consider whether the standard of review of the adequacy of the warnings depends on whether the review is of a settlement.

(1999) 76 Cal.App.4th 264, 267 [90 Cal.Rptr.2d 207].) In federal class action litigation, the trial court determines whether the judgment the court is being asked to enter is "fair, reasonable, and adequate." (Fed. Rules Civ. Proc., rule 23(e)(1)(C), 28 U.S.C.; see, e.g., *In re Wireless Tele. Fed. Cost Recovery Fees Lit.* (8th Cir. 2005) 396 F.3d 922, 932–933.) That test has been adopted by some California courts as a tool to evaluate a proposed class action settlement. (*Dunk v. Ford Motor Co., supra*, 48 Cal.App.4th at p. 1801 [56 Cal.Rptr.2d 483].)

CAG urges this court to employ that test, analogizing this case to a class action and claiming that "[a] private enforcer acting under Proposition 65 is essentially a representative of a class of persons comprised of the public." Respondents argue Proposition 65 litigation fundamentally differs from class action litigation and, therefore, cannot be subject to the "fair, reasonable, and adequate" test.

■ Neither side is correct. The "fair, reasonable, and adequate" test derives from rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.), which provides in pertinent part: "The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." The Legislature did not include the "fair, reasonable, and adequate" test when it codified judicial review of a Proposition 65 settlement and the absence of the rule indicates that it does not apply to Proposition 65 litigation. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827 [4 Cal.Rptr.2d 615, 823 P.2d 1216] [court may not add provisions to a statute].)

Although the "fair, reasonable, and adequate" test does not apply, the prerequisites for approving a Proposition 65 consent judgment are similar. To stamp a consent agreement with the judicial imprimatur, the court must determine the proposed settlement is just. Respondents' contrary view ignores the general rule that a trial court should not approve an agreement contrary to law or to public policy. (*Bechtel Corp. v. Superior Court* (1973) 33 Cal.App.3d 405, 412 [109 Cal.Rptr. 138]; see also *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 13 [84 Cal.Rptr.2d 715] ["[A] court cannot validly enter a judgment or order which is void even if the parties agree to it."].) Respondents also disregard the specific rule that " 'the court cannot surrender its duty to see that the judgment to be entered is a just

one, nor is the court to act as a mere puppet in the matter.' " (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court, supra,* 50 Cal.3d 658, 664.)[11]

In the context of Proposition 65 litigation, necessarily brought to vindicate the public interest, the trial court also must ensure that its judgment serves the public interest. Health and Safety Code section 25249.7, subdivision (f)(4) provides: "If there is a settlement of an action *brought by a person in the public interest* under subdivision (d), the plaintiff shall submit the settlement . . . to the court for approval . . . and the court *may* approve the settlement only if the court makes all of the following findings: [¶] (A) Any warning that is required by the settlement complies with this chapter. [¶] (B) Any award of attorney's fees is reasonable under California law. [¶] (C) Any penalty amount is reasonable . . . ." (Italics added.) Settlement without consideration of the public interest eviscerates the purpose of Proposition 65, and the plain language of the statute contradicts respondents' argument that the public interest is "not one of the three findings stated by the legislature to be required."[12] (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836] ["Interpretive constructions which render some words surplusage, defy common sense, or lead to mischief or absurdity, are to be avoided."].) The Legislature used the permissive term "may" when it authorized court approval of a settlement that has compliant warnings and reasonable fees and penalties. There is a difference between saying the court cannot approve a settlement without these conditions and the court must approve a settlement if it finds these conditions. (*Consumer Defense Group, supra,* 137 Cal.App.4th at p. 1208.) In this case, where the judgments contained 20 pages of provisions, the court should have considered each provision; it was not relegated to assessing only the warnings, penalties and fees.

### C. *Judicial Review Is Consistent with Policies Favoring Settlement*

Respondents (including CDG who is purporting to represent the public) argue that fairness concerns are irrelevant and the inquiry, which impedes rather than encourages settlements, should be avoided. Otherwise, they warn, unnecessary litigation and wasted court time is inevitable. To some extent respondents are correct—California law favors the settlement of disputes as our high court clarified in *Neary v. Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] (*Neary*). Settlement is efficient; it reduces costs, saves resources, and minimizes court

---

[11] In contexts similar to Proposition 65 litigation, where judicial review is required, the trial court is required to ensure that its judgment is fair. (*U.S. v. Telluride Co.* (D.Colo. 1994) 849 F.Supp. 1400, 1402; *U.S. v. Southeastern Penn. Transp. Authority* (3d Cir. 2000) 235 F.3d 817, 823; *In re Tutu Water Wells Cercla Litigation* (2003) 326 F.3d 201, 207.)

[12] Further undesignated statutory citations are to the Health and Safety Code.

congestion. (*Id.* at pp. 277–278.) The parties are best positioned to understand their interests and resolve a dispute in a mutually beneficial manner without court intervention into the settlement. *Neary* teaches that "[i]n ordinary civil actions . . . the parties come to court seeking resolution of a dispute between them." (*Id.* at p. 280.)

■ Unlike *Neary*, this is not an ordinary civil action. CDG purports to act on behalf of the public and the settlement potentially has broad implications as CDG describes it as a "standard for the industry as a whole." More significantly, unlike in a settlement between two parties, the Legislature expressly required judicial review of a Proposition 65 settlement brought by a private plaintiff in order to safeguard the rights of the public. The parties' agreement to a mutually beneficial set of terms does not ensure that the policies underlying Proposition 65 or the public's interest in the litigation were considered. In contrast to *Neary*, where the court made clear that "[c]ollateral estoppel [was] not an issue . . . ." (*Neary*, *supra*, 3 Cal.4th at p. 284), respondents seek to use the doctrine of collateral estoppel and refer to it expressly in each consent judgment.

Where the rights of the public are implicated, the additional safeguard of judicial review, though more cumbersome to the settlement process, serves a salutatory purpose. It reminds the parties that, in addition to their own interests, the public interest is also relevant. It also reinforces the rule that the "strong public policy favoring the settlement of litigation . . . does not excuse a contractual clause that is otherwise illegal or unjust." (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1127 [131 Cal.Rptr.2d 387].) To the extent that judicial review deters settlements, it should deter only those that are unjust or ignore the public interest.

### D. *Application of the Correct Test Compels Reversal*

Some of the provisions of each judgment are so contrary to the public interest that standing alone, they require the reversal of the judgments. The broad release[13] purports to preclude the public from future litigation of both

---

[13] Each judgment contains a provision identical or similar to the following: "Except for such rights and obligations as have been created under this Consent Judgment, Plaintiff, on its own behalf and bringing an action 'in the public interest' . . . and 'acting for the general public' . . . with respect to the matters regarding the Noticed Chemicals alleged in the TMG Lawsuit and the CAG Lawsuits, does hereby fully, completely, finally and forever release, relinquish and discharge: (a) Wyndham International, Inc., and American Patriot Hospitality, Inc., (b) the Franchisees, (c) the past, present, and future owners, lessors, sublessors, managers and operators of, and any others with any interest in, the Covered Properties, and (d) the respective officers, directors, shareholders, affiliates, agents, employees, attorneys, successors and assigns of the persons and entities described in (a), (b) and (c) immediately above (collectively (a), (b), (c) and (d) are the 'Released Parties') of and from any and all claims, actions, causes of action,

known claims and additionally discovered ones. Under the terms of the release, any member of the public loses the right to pursue a claim regardless of whether CDG had knowledge of the claim and regardless of whether relevant scientific knowledge has changed. The judgments determine that "[t]he provision of said warnings shall be deemed to satisfy any and all obligations under Proposition 65 by any and all person(s) or entity(ies) with respect to any and all environmental and occupational exposures to Noticed Chemicals" and therefore do not cover only past conduct as respondents argue. The provision allowing defendants to unilaterally opt out[14] arguably renders each judgment illusory. Similarly, the no force and effect provision not only grants the parties unusual powers to, on their own, invalidate a judgment, but it also renders precarious any benefit received by the public from the judgment. Because these provisions require reversal, we need not

---

demands, rights, debts, agreements, promises, liabilities, damages, accountings, costs and expenses, whether known or unknown, suspected or unsuspected, of every nature whatsoever which Plaintiff or CAG has or may have against the Released Parties, arising directly or indirectly out of any fact or circumstance occurring prior to the date upon which the Judgment becomes final, including any and all appeals, relating to alleged violations of the Unfair Competition Act and/or Proposition 65 by the Wyndham Defendants and/or the Franchisees, and their respective agents, servants and employees, being hereinafter referred to as the 'Released Claims.' In sum, the Released Claims include any and all allegations made, or that could have been made, by Plaintiff and/or CAG with respect to the Noticed Chemicals relating to Proposition 65 and the Unfair Competition Act." "Plaintiff hereby waives and relinquishes all of the rights and benefits that Plaintiff has, or may have, under California Civil Code section 1542 (as well as any similar rights and benefits which they may have by virtue of any statute or rule of law in any other state or territory of the United States). Plaintiff hereby acknowledges that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true with respect to the subject matter of this Consent Judgment and the Released Claims, but that notwithstanding the foregoing, it is Plaintiff's intention hereby to fully, finally, completely and forever settle and release each, every and all Released Claims, and that in furtherance of such intention, the release herein given shall be and remain in effect as a full and complete general release, notwithstanding the discovery or existence of any such additional or different facts."

[14] "Wyndham Defendants further expressly reserve the right, upon notice to Plaintiff, to withdraw from this Consent Judgment at any time up until such time as (i) the CAG Lawsuits are either dismissed with prejudice as to all Wyndham Defendants or, alternatively, judgment is entered in favor of Wyndham Defendants in the CAG Lawsuits, or (ii) any third-party litigation involving the CAG Lawsuits or the effect of the Consent Judgment on the CAG Lawsuits becomes final, including any and all appeals or any other third-party litigation contesting the validity of this Consent Judgment."

Based on another provision, the parties may on their own invalidate the judgment if certain specified events happen. For example, if CAG "files litigation to contest the validity of this Consent Judgment . . . then upon notice by any one of the Parties hereto to the other Parties hereto, this Consent Judgment shall not be of any further force or effect and the Parties shall be restored to their respective rights and obligations as though this Consent Judgment had not been executed by the Parties." The judgment allows the hotels to withdraw from it "until the Consent Judgment becomes final, including any and all appeals or any other third-party litigation contesting the validity of this Consent Judgment."

evaluate each provision in the six judgments. Our silence regarding the remaining provisions should not be interpreted as approval of them.

Finally, the record belies respondents' argument that the trial court actually considered whether the settlements served the public interest. The court identified but never resolved key issues such as justiciability. When the court expressed concern that CHLA and CDG were friendly and initially was "not inclined to enter a 'Stipulated Consent Judgment' that will serve only as a shield against legitimate prosecution of Proposition 65 violations," the court never fully addressed these crucial concerns. Respondents repeatedly (and incorrectly) "remind[ed]" the court that "under the statutory mandates for approval of settlements, your inquiry is quite limited from the standpoint of reviewing settlements under Prop 65. [¶] Under [Health and Safety Code section 25249.7, subdivision (d)], the court's . . . required to [determine] . . . is the warning, clear and reasonable, two, are the attorneys fees reasonable, and three, are the penalties reasonable. [¶] That's the confines of the court's inquiry from the standpoint of whether the settlement passes muster as being in the public interest. [¶] So I submit to your Honor that the sausage making, if you will, of how we got here, while it may have pecuniary or some interest in terms of, I guess, issues that really don't pertain to the settlement, it's really not the focus of what we are here and what the court's job is in relation to the settlement."

██ The trial court never acknowledged that it had a duty to find that the settlements were in the public interest and the provisions of the judgments in this case do not serve the public interest. The trial court never identified the specific benefit the public would reap from the consent judgments, and one court has held that generic warnings, such as those in this case, are "at the direct expense of the public interest." (*Consumer Defense Group, supra*, 137 Cal.App.4th at p. 1218, italics omitted.) For these reasons, the judgments must be reversed.

We have focused on the judgments, not the notice, because of the unusual procedural posture of the case where the judgments were challenged by a party who was not entitled to notice. If the parties choose to resubmit proposed judgments to the trial court, in addition to considering whether the judgments serve the public interest as discussed in this opinion, the court must consider (1) justiciability as discussed in *Johnson & Johnson, supra*, 132 Cal.App.4th 1175; (2) notice as discussed in *Consumer Defense Group, supra*, 137 Cal.App.4th 1185; and (3) the statutory requirements of adequate warnings, reasonable fees, and reasonable penalties.

## DISPOSITION

The consent judgments are reversed. Appellant and the Attorney General are entitled to costs on appeal.

Boland, J., and Armstrong, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.